In the Matter of the Probate of the Will of James D. White,
Deceased.

*It seems,* where one persistently believes supposed facts, which have no
real existence except in his perverted imagination, against all evidence
and probability, and conducts himself, however logically, upon the
assumption of their existence, the delusion is insanity.

Where, however, there are facts, insufficient although they may be in
reality, from which a prejudiced, narrow or bigoted mind might derive
a particular idea or belief, it cannot be said that the mind is diseased, in
that respect.    The fact that the belief is illogical or preposterous is not
evidence of insanity.

W. died, leaving a widow, a daughter by her, and a son by a former
marriage, him surviving, and leaving a will, probate of which was con-
tested · by his son on the ground of mental incapacity.    W. was, at the
time of his death, eighty-eight years old, having retained, to an extraor-
dinary degree, vigor of mind and body, and having continued to man-
age his own affairs, and in full possession of his reasoning and reflective
faculties.    He was a man of strong will and determined character, posi-
tive and independent in his opinions, and unyielding in them when
opposed.    From his youth, W. had entertained a bitter dislike of the
order of free masons.    In August, 1884, he had a dispute with neigh-
bors in regard to the location of boundary lines; a survey made, which
was unsatisfactory to him, was repeated, at the suggestion of his son.
The line ran nearly identically with that of the previous surveys.    W.
was not satisfied.    His son combatted his views.    The neighbors and
the surveyor were masons, and during the dispute, he discovered his
son was also.    He became angered and charged that his son had con-
spired with the others to defraud him of his rights; this became a
settled conviction upon his mind, and the breach between them grow-
ing out of this conviction was never closed.    The will, made in July,
1885, left a small legacy to the son, and the balance of the testator's
estate was given to the widow and daughter.    It appeared that W. had
made several prior wills, one before the breach, making a similar disposi-
tion of his property.    *Held,* that the evidence failed to show the testator
was laboring under, and the will was the offspring of, an insane delu-
sion; and that a decree admitting it to probate was proper.

·  (Argued May 1, 1890; decided June 3, 1890.)

Appeal from judgment of the General Term of the Supreme
Court in the fourth judicial department, entered upon an order
made April 30, 1889, which affirmed a decree of the Surro-

Statement of case.

gate's Court of Madison county, admitting to probate the will of James D. White, deceased.

The material facts are stated in the opinion.

*E. Countryman* for appellant. The decedent was laboring under the insane delusion that his son was engaged in a conspiracy to injure and defraud him at the time he executed the paper purporting to be his last will. The paper is the offspring of his delusion, and is, therefore, invalid. (Bushw. on Insanity, §§ 363, 381; *Lathrop Case*, 67 Barb. 590; 5 Hun, 560; *Stanton* v. *Weatherwax*, 16 Barb. 259; *Delafield* v. *Parish*, 25 N. Y. 9; *Van Guysling* v. *Van Kuren*, 35 id. 70; *Tyler* v. *Gardner*, 35 id. 559; *Banks* v. *Goodfellow*, L. R. [5 Q. B.] 549; *Riggs Case*, 95 N. Y. 503; *Hopper Case*, 33 id. 619; *Boughton* v. *Knight*, L. R. [3 P. & D. Div.] 64; *Merrill* v. *Ralston*, 5 Redf. 220, 221; *Dew* v. *Clark*, 3 Add. Ecc. 79; Hamm. on Insanity, 269, 270, 271, 328, 340, 341, 343, 359, 360.) It was error to receive the testimony of the widow, under objection, to the effect that she never heard the decedent charge that his son, the contestant, had conspired with Lewis and the others named to cheat him out of his land, or any part of it. (Code Civ. Pro. § 829; *In re Eyseman*, 113 N. Y. 62.)

*C. W. Underhill* for appellant. Upon the uncontradicted evidence, this court should hold as a question of law that this is a case of delusional insanity. (*S. F. Society* v. *Hopper*, 33 N. Y. 624; *Lathrop* v. *Board*, 67 Barb. 590; 5 Hun, 560; *In re Hunt*, 110 N. Y. 283; Clouston on Mental Diseases, 190.) The question of delusive insanity was a question of law on the facts. (*Eyseman's Case*, 113 N. Y. 62.) The will was void because of undue influence. (Schouler on Wills, § 225; *In re Shaw*, 17 Wkly. Dig. 469, 470; *C. A. Society* v. *Loveridge*, 70 N. Y. 394; 65 id. 95, 96; *R. P. A. Co.* v. *Warner*, 1 Wkly. Dig. 204; 6 Hun, 516; 29 id. 283, 289; 68 N. Y. 209, 213; 33 id. 618, 619; 25 id. 95; 14 id. 562; 45 id. 71; 73 id. 587.)

*Joseph Mason* for respondent. The surrogate and General Term did not err in deciding upon the evidence in this case that the testator, James D. White, was of sound mind and memory and competent to make a will at the time he made the will in question. (*In re Bull*, 19 N. Y. S. R. 834; 2 Brad. 449; 33 N. Y. 619; 15 Abb. [N. C.] 141; Buswell on Insanity, § 15; 1 Whart. Med. Juris. § 60; 16 Barb. 263; 2 Redf. Sur. Rep. 37.) It is a question of law for the court to determine upon the whole facts and circumstances of each case whether it is shown that the mental condition of the party is that of unreasonable prejudice and perverse judgment or of an insane delusion. (Buswell on Insanity, § 374; 1 Whart. Med. Jur. § 43; Schouler on Wills, § 162; 33 N. Y. 619; 7 N. Y. S. R. 739; 15 Abb. [N. C.] 141; 2 Brad. 449; 34 N. Y. 190; 77 id. 533; *Lathrop* v. *Borden*, 67 Barb. 590.) The surrogate and General Term did not err in deciding that the will in question was not procured by fraud, circumvention and undue influence. (*Wade* v. *Hubbard*, 2 Redf. 378; *Gardiner* v. *Gardiner*, 34 N. Y. 163; *C. A. Society* v. *Loveridge*, 70 id. 394; *Max* v. *MacLynn*, 4 Redf. 455; *Cudney* v. *Cudney*, 68 N. Y. 148.) The surrogate erred in denying the motion of the proponent of the will, made at the close of the testimony, to strike out the testimony of the contestant himself, of Sarah Lewis, Edward H. Lewis, Sarah L. White, Mary Morgan and James Wetmore, in which are given statements, declarations or conversations of the proponent with the contestant and the other witnesses named, not in the presence of the testator or in which he participated, upon the grounds stated in the motion to strike out such testimony. (*Shailer* v. *Bumpsted*, 99 Mass. 122; *Labau* v. *Vanderbilt*, 3 Redf. 384, 406; *In re Baird*, 7 N. Y. S. R. 758; *Brush* v. *Holland*, 3 Bradf. 250.) The surrogate also erred in denying the proponent's motion to strike out the testimony of Perry Smith wherein he testifies to the acts or declarations of Mrs. White or Alida as communicated to him by the testator upon the question of undue influence. (*Cudney* v. *Cudney*, 68 N. Y. 148; *Labau* v. *Vanderbilt*, 3 Redf. 413, 425; *Potter* v. *Baldwin*, 3 Am. Prob.

Rep. 292.) The surrogate erred in denying the proponent's motion to strike out the testimony of S. Perry Smith as to communications testified to by him as having been made to him by Mr. White at the time he drew the several wills testified to by him and the communications and statements which he testified Mr. White made to him upon the subject of any of these wills; and the testimony of Mr. Smith in which he gives the contents of the wills drawn by him for the testator. (Code Civ. Pro. § 835; *Pearsall* v. *Elmer*, 5 Redf. 181; *Myers* v. *Dorman*, 34 Hun, 115.) The admission of improper evidence in proceedings before a surrogate for the probate of a will is not ground for reversal of his decision admitting the will to probate, if it appears from the whole case that the will was properly sustained. (*Brick* v. *Brick*, 66 N. Y. 144; *Snyder* v. *Sherman*, 88 id. 656; Code Civ. Pro. § 2545.) The surrogate having admitted this will to probate upon conflicting evidence which was amply sufficient to authorize such decision, and his decree having been affirmed by the Supreme Court, this court has no power to review the same upon questions of fact. (*Marx* v. *McGlynn*, 88 N. Y. 357; *In re Ross*, 87 id. 514; *Davis* v. *Clark*, Id. 623; *Rollwagen* v. *Rollwagen*, 3 Hun, 121.)

GRAY, J. The questions, which this record brings more prominently before us, are whether the decedent's mind was so affected, in relation to his testamentary dispositions, by undue influences exerted on the part of his wife and daughter, or by an insane delusion respecting his son, as to render his will invalid. By its terms he gave a legacy of $150 to his only son by a former wife, and of the residue he gave one-half to his widow for her life, and the other half to his only daughter by the second wife during the life of his widow. After his widow's death he gave all of the residuary estate to his daughter. The estate amounted to only about $7,000.

The son objected to the admission to probate of this will, on the grounds stated, of fraud and undue influence, and of the mental incapacity of the testator to make a will. The con-

testant was unsuccessful before the surrogate and the General
Term, and he has appealed to this court from their decisions.
As to the first ground of objection to the probate, I am unable
to find in the record any facts warranting the inference that
either wife, or daughter, unduly influenced the testamentary
disposition. I can find no proof of the interference by, or
influence of either. As I read the evidence, the strength of
will and the determined character of the decedent were such,
up to his last days, as to render him not only very self-dependent
in matters of opinion and judgment, but even arbitrary. Besides
those characteristics, the schemes of the several wills, which
were made at various times between June, 1884, and the one
last made and now before us, tend, when examined, to nega-
tive the idea of any undue influence on the part of the wife;
and, as to the daughter, there is no proof at all of her influenc-
ing her father's will. The present will is on the same plan as
one made in June, 1884, except that instead of $250 then,
there is now given $150 to the son. In each the widow was
given a life use of one-half of the estate. Prior to June, 1884,
the only will we are informed of as having been made was in
1868. Later, in the fall of 1884, testator made another will,
by which he gave the use of all his estate for life to his widow,
and, after her death, divided it equally between the son and
daughter. Then, in June, 1885, two further wills were made
on succeeding days; in the first of which he gave his son $400,
and the balance either equally to his wife and daughter, or
$2,000 to the wife and the residue to the daughter; and in
the second of which the son was given $200, the daughter
$1,000 and the wife the residue. In July, 1885, the will in
question was made. Had there been any undue influence
practiced by his wife, it would hardly have been in the
direction of lessening her beneficial interest in the testator's
estate, as is the fact here. The only will which materially
differed with respect to the son's interest was the second one
of this series of five wills, which was executed in October,
1884, and which gave him one-half of the residuary estate
after the widow's death. But, while that differs from the

present will, it should be observed that it also differed from the preceding will in June, 1884, whereby he was only to receive $250. It also differed from the will made in 1868, whereby he was only to receive $200, except in the event of his sister's failing to attain her majority. Therefore, aside from the extreme improbability of any malign influence of the wife having successfully operated upon a man of the independent and self-willed type that the decedent is described to have been, we have the history of these various testamentary plans to show us that no such influence can well have existed.

But the case of the appellant really turns upon his proposition, that, at the time this will was made, the decedent was laboring under an insane delusion that his son was engaged in a conspiracy to injure and defraud him, and that the will was the offspring of such a delusion; and, therefore, was invalid. The delusion alleged is that his son, being a member of the masonic order, had leagued with other masons to cheat him out of his land. There is no doubt but that the decedent was bitterly opposed to the order of masons and habitually expressed himself in the strongest terms in condemnation of their honesty and practices. At the time of his death, in 1886, the testator was about eighty-eight years of age and was a farmer by occupation. Up to the time of his death, he retained, to an extraordinary degree, both vigor of mind and body, and continued to manage his own affairs. The testimony of those, who lived in his neighborhood and who had dealings with him, exhibits him as in possession of the reasoning and reflective faculties, but positive and independent in his opinions, and unyielding in them when opposed. These features in his character are conceded, in fact, by the appellant's counsel, and, also, that he possessed in a high degree estimable personal qualities, and that his domestic and social life caused him to be loved and respected. But the son founds his claim upon a mental incapacity in the deceased to make a testamentary disposition, when he was concerned and was to be the subject of its distributory scheme. He adduces, in order to start a foundation for such a claim, proof of

certain disputes between his father and some neighbors, respecting the true location of boundary lines of their contiguous properties. These occurred about the month of August, 1884. A survey, which was unsatisfactory to the deceased, was repeated, at the suggestion of the appellant, by a surveyor, named Campbell. His line ran nearly identically with that of the previous survey. A dispute also arose concerning an obligation to build a portion of a fence. The deceased was not satisfied with the result of the surveys and would not agree as to the fence matter. His son combated his views and endeavored to show that he was in error. He became angered and the result was that he charged that his neighbors and the surveyor and his son were masons and had conspired with the object of defrauding him in his rights. He accused them of fraud and deception, and used opprobrious epithets in speaking to and of them. This idea of the leaguing together of his son and others became a settled conviction of his mind and undoubtedly influenced his feelings towards his son. From his youth, the deceased had entertained this bitter dislike of the masonic order and it most materially affected his feelings towards its members. When he discovered that his son was a mason, while these disputes were pending, it aroused all his prejudices and so embittered his nature, as to cause him to involve him in a common dislike and distrust. It may have made him believe in the possibility of his son being capable of unfair conduct, in the matters in dispute. From the time of their occurrence, in August 1884, to the year of his death, the breach in the relations of father and son was kept open, as the result of the former's feelings.

But, conceding what the appellant alleges, that the deceased believed what he said of his son's purpose to cheat him, through the aid of brother masons, and that a mason was incapable of honest conduct, I do not think that entertaining such a belief is conclusive evidence of an unsound mind. There is no pretence that in any other respects the deceased was lacking in mental capacity, either before these disputes

occurred in 1884, or up to the time of his death in 1886. As it was said by Judge DENIO in the case of *Seamen's Friend Society* v. *Hopper* (33 N. Y. 624) " on questions of testamentary capacity courts should be careful not to confound perverse opinions and unreasonable prejudices with mental alienation. These qualities of mind may exist in a high degree and yet, as far as regards the view which the law takes of the case, the subject may be sane and competent to perform a legal act and be held responsible for crime." We have here a case where the possession of general vigor and intellectual capacity is conceded; but it is insisted that in respect to his son, as the natural object of testamentary bounty, the deceased was under such an insane delusion that he could not act sensibly in disposing of his property after his death.

Is that quite true, taken with reference to what had been done in previous wills; or with reference to the facts, from which the appellant deduces the legal conclusion of the existence of an insane delusion? I think not. As to the evidence relating to the various testamentary dispositions of his property, the testator is not shown to have made any such appreciable difference in the distribution by his final will from that in wills made previous to the occurrence of the quarrels, as to warrant us in supposing that his mind had become affected. As to the testator's belief that there was collusion between neighbors, surveyor and his son to defraud him, we cannot say that there was absolutely no basis for any such reasoning by testator. There were the facts that the testator and his neighbors disputed on questions of boundary lines and fences; that his son disagreed with his views of his rights in the matters; and that one of the neighbors, his son and the surveyor, recommended by his son, were masons. Can we say that because he could not believe anything good of the masonic fraternity, and because he supposed them bound to stand by each other as against an outsider, that he was influenced by an insane delusion? Delusion is insanity, where one persistently believes supposed facts, which have no real existence, except in his perverted imagination, and against all evidence and

probability, and conducts himself, however logically, upon the assumption of their existence. That was so held in *Seamen's Society* v. *Hopper* (*supra*). But, if there are facts, however insufficient they may in reality be, from which a prejudiced, or a narrow, or a bigoted mind might derive a particular idea, or belief, it cannot be said that the mind is diseased in that respect. The belief may be illogical, or preposterous, but it is not, therefore, evidence of insanity in the person. Persons do not always reason logically, or correctly, from facts, and that may be because of their prejudices, or of the perversity, or peculiar construction of their minds. Wills, however, do not depend for their validity upon the testator's ability to reason logically, or upon his freedom from prejudice. (*Clapp* v. *Fullerton*, 34 N. Y. 190.)

If we should hold that this will was invalid, because the views entertained by testator respecting his son's affiliation with free masonry and its influence upon him were exaggerated and mistaken and the product of an unsound mental condition, we might establish a dangerous precedent for the many cases which must frequently arise, where the testator can be easily shown to have been headstrong and unreasonable in his prejudices and dislikes toward those who are the natural objects of his testamentary bounty. The decedent here seems to have been unreasonable in his opinions concerning the motives and conduct of free masons, but I cannot perceive, conceding all the appellant presents in the way of facts, that the particular scheme of distribution of this estate must be solely attributed to the domination of these opinions. It was natural that, being possessed of but a small property, the testator should prefer to leave it to the wife and daughter, rather than to the son, who was a man of mature years and a practicing lawyer, and, presumably, better able to support himself than would be the women. Furthermore, as I have said, the will is similar to others made before the occasion for the testator's bitter feelings arose.

Exceptions were taken to the admission and rejection of evidence, but, after a careful consideration of them, it does not

appear that the appellant was prejudiced in any instance, or that the result was affected by any errors in that respect.

The order appealed from should be affirmed, with costs.

All concur.

Order affirmed.