> Testator was afflicted with hemiplegia and Bright's disease. He lived alone, except for his attendant, and tried many doctors, but distrusted them all, on account of their failure to cure him. His temper grew irascible, and he became tired of attentions from his few relatives, and suspicious of the grounds for their attentions. He was aware of his characteristics, and admitted that he was hard to get on with, and that he could inspire no friendship, because he never felt it. The will in issue was drawn by an attorney after several interviews, in which testator explained his family relationships, and finally decided to leave his estate to the beneficiary, as being a relative of a deceased half-sister, from whom most of his property came, and of whom he had been very fond. On the other side, several physicians testified that he was mentally unsound. *Held*, that deceased was possessed of testamentary capacity.

Petition for the probate of the will of James McKean, deceased.

Albert Stickney, for proponent.

Alexander Thain and Walter L. McCorkle (Delano C. Calvin, of counsel), for contestants.

FITZGERALD, S. The probate of decedent's will is contested on the grounds of undue influence and of mental incapacity. The testimony adduced in support of the former ground is so meager and insufficient that I do not consider a discussion thereof necessary, and I shall therefore confine myself solely to the proofs on the question of incapacity. The evidence was presented at great length and through many witnesses, and, in view of the very earnest and able contest that has been waged, I have been at great pains to carefully consider the conflicting views that the proponent and the contestants developed as to the main issue before the court. Decedent died on March 14, 1898, at the age of 47 years. He had suffered for several years from hemiplegia, the left side of his body being almost wholly paralyzed. He was also afflicted with Bright's disease. He had no near relatives, and was unmarried; his nearest next of kin being a brother and sister of his father. The bulk of his property came to him through the will of a half-sister, of whom he appeared to be very fond, and whose death he took very much to heart. It seems that in the year 1896 he made a will, in which he remembered certain cousins of his, residing in Canada, and his paternal uncle. The paper now offered for probate was executed on February 19, 1898, and gives his entire property to a relative of his deceased half-sister. The period during which we must endeavor to ascertain the condition of the decedent's mind begins with his half-sister's death, in the fall of the year 1896.

.It was shortly before this that he received the paralytic stroke, which contributed so largely to his death two years later. He lived in one of his houses alone, save for the attendance of a young man, who acted as his attendant and nurse; and during that time he was doing his utmost to cure himself of the diseases that were upon him, only to find .that no improvement resulted. He tried physician after physician, until he grew bitter at the profession whose servants helped him so little. He became suspicious of them, called them humbugs, and declared that their drugs were poisons. He was a man of great intelligence, and, indeed, of some culture; and his conversations on many topics, carried on until very near the end, appear to have been most interesting. Yet, living as he did, a recluse and an invalid, his temper became daily more soured. He was peevish and irascible, at one moment friendly, at the next querulous; and these moods were reflected in his conduct towards his relatives. Although they acted kindly towards him, he often felt that, after all, they only cared for what he might leave them, and not for what he was himself. He often affirmed that they were conspiring against him. In the winter of 1897 he visited his Canadian cousins, who showered their attentions upon him. He found no relief in his condition, as he had fondly .anticipated, and came back to New York to live the last three months of his life, tired of the attentions of his cousins and embittered, against them. On his return a quarrel took place with the cousin who was his nurse, and they separated. He also became sharply antagonistic to his uncle, by reason, perhaps, of his misconstruction of certain facts which need not be here detailed. It should also be added that the suspicions which he felt and openly announced as to the purposes of his relatives were directed as well and as strongly against the beneficiary under his will, whom he saw frequently on his return from Canada. The foregoing presents a brief portrayal of certain of decedent's characteristics which must be taken into account. The contestants urge that the wholly unwarranted attitude of testator towards his relatives was, in point of fact, an insane delusion, brought about through the inroads of the maladies from which he suffered, and that consequently the will executed in February, 1898, was not a rational act. In support of this contention, we have the testimony of various of the physicians who attended the deceased. Most of these testified that he was mentally unsound; one of them designating his insanity of the term "folie brightique," the craziness resulting from Bright's disease. An expert designated him as totally insane. Certain lay witnesses also characterized the testator as an irrational being. I have carefully considered this testimony, and I cannot concur in the sweeping statements thus made as to decedent's mental condition. The observer who studies a man's mind with a view of passing judgment on its soundness is governed, of course, largely by such facts as. come directly before him. Could he see the subject whom he pronounces insane in other lights, which did not happen to be revealed to him, he might well change his conclusions, and recognize as erratic or morose that which he first termed "insane." So many aspects of the workings of decedent's mind have been shown in the present case -that it may well be that all of the facts which enter into the view

point of the court on this question were not known to the witnesses. who testified as to his insanity. An insane delusion is the persistent belief in certain supposed facts which plainly do not exist, and of the nonexistence of which the person laboring under the delusion cannot be convinced, but continues acting thereunder against all evidence and probability. In re White, 121 N. Y. 406, 413, 24 N. E. 935. Let us see in which way the testator himself explained his attitude towards his relatives. While in Canada, in the winter of 1897, he wrote a letter to his uncle in New York, which has been called to my attention as indicative of his mental processes. I quote the following significant sentences:

"I am well aware that I am not the pleasantest person in the world, the easiest to get along with; and, when I think of a few things, my good nature, all my consideration for others can hardly be called, well, even decent. * * * I do not seem to have the faculty for causing a feeling of real friendship, possibly because I never feel it myself. My feelings have not been the pleasantest in regard to some of my friends (considered so). I have not entertained, as I suppose you must know, the highest opinion of your own feeling of affection. or regard or friendship."

, He then complains that more consideration could have been given him, and, although he acknowledges kindnesses that were shown him, he admits his ingratitude. "I can't," he says, "make any very strong claims in the way of gratitude. That is a thing we must grow into." Here, certainly, we have a very frank avowal. The character of decedent is revealed through his own analysis. He shows himself to be an unlovable, selfish, ungrateful man, whose cynicism attributes these very qualities to all of those with whom he comes in contact. It is apparent that he could have no genuine affection for his relatives, and that the attentions paid by them to him were but so much food for his unfortunate philosophy. Still, he seems to have recognized his shortcomings and his perverse nature, and he realized that they were the basis of his misanthropy. It cannot be held that because a man is ungenerous, unkind, and unjust, and misconceives the conduct of his fellows, he is devoid of testamentary capacity. Pessimistic beliefs are not insane delusions. Decedent's disgust for his relatives was not, in my opinion, due to insanity, but, rather, to his morbid views of life, which became more and more intensified as he approached death. His power of introspection, his recognition of his own lack of good feeling towards others, show that he understood himself too well to permit it to be said that any delusion from which he suffered could properly and legally be designated as insane. It should be further said with reference to the disagreement with his uncle shortly before he made his will that certain facts existed which, while no doubt ordinarily insufficient to create distrust, might form a sufficient basis for suspicion to a temperament such as possessed by testator. The existence of any facts, however meager, from which a bigoted mind might derive certain illogical and preposterous beliefs, gives sufficient answer to the allegation of insane delusion. In re White, supra. Further light is thrown on decedent's testamentary capacity when we consider the care which was given both to the preparation and execution of the will. In the last week of January, 1898, he wrote to his attorney to come and see him. Several inter-.

views were had as to the contemplated will. He took some time to decide upon the object of his bounty. He explained his family relations to his lawyer, complained of his relatives, and said that his Canadian cousins were overattentive and bored him. After, apparently, much thought, he concluded to leave his estate to the beneficiary under the will here in contest, for the reason, as he explained to his attorney, that he received most of his property from his half-sister, and he thought it but fair that it should go to one of her relations. To my mind, this is most lucid proof of testamentary capacity. The will was executed with a strict observance of the formalities provided for by the statute, and on this occasion the testator had a lengthy conversation with one of the witnesses, a classmate of his, upon their college days and school friends. Thereafter the testator emphasized his testamentary desire by making a holographic copy of the will thus executed. This circumstance naturally has an important bearing on the issue of decedent's testamentary capacity. It is a testator's privilege to do as he desires with his own, and his testamentary disposition of his property is not invalidated because its provisions are unequal, or the result of passion or of unjustifiable sentiments. Dobie v. Armstrong, 160 N. Y. 584, 593, 55 N. E. 302. I am satisfied that the decedent's testamentary capacity was sufficiently established, and probate of the paper propounded as his will must therefore be sustained.

Probate decreed.