## In re IREDALE'S WILL.

(Supreme Court, Appellate Division, Third Department. June 28, 1900.)

1. WILLS—TESTAMENTARY CAPACITY.

If a testatrix had sufficient intelligence to comprehend the condition of her property, her relations to those who were the natural objects of her bounty, and the nature and consequences of her act in executing the will, it is valid, if freely executed; and lack of testamentary capacity cannot be inferred from advanced age, or enfeebled condition of mind and body.

2. SAME—EVIDENCE.

Testatrix, unaided, gave specific directions for the execution of her will. After the first draft was prepared she changed its terms, added a provision for the maintenance of her burial lot, and gave her reason for changing the amounts paid to various beneficiaries. The beneficiaries were her nearest living relatives. At the time of giving the attorney who drafted the will her instructions concerning it, she consulted with him about other matters in a manner indicating that she understood the nature and extent of her property. At the time of the execution of the will she was in a feeble condition. Down to the time of her death she, with some advice and assistance, managed her own property, and talked with her friends about what she read and about her relatives, and who and where they were; and frequently wrote to some of them. Within a year prior to her death she wrote to a niece to visit her, sent her money for the purpose, and gave her specific directions about the trains. A comprehensive memorandum of her property, made by her within a year prior to her death, was found among her effects. Testatrix's physician testified that she did not think that testatrix was capable of understanding ordinary business transactions, but it does not appear that witness had any business transactions with testatrix, except two in reference to her own bill for services, one of which was satisfactorily disposed of, and in the other of which testatrix questioned the amount of her bill. About the time testatrix made the will, she frequently used profane language, and, though comparatively wealthy, asserted that she would have to go to the poor house; but it was shown that at times prior thereto, when her mental capacity was undoubted, she had made similar statements. She frequently threatened to kill herself. One of the objectors to the probate of the will and his wife testified that, while living with them, testatrix refused to eat because she thought the food was poisoned. The will gave to a niece, who had left her own home for the purpose of caring for testatrix, a sum in excess of the sum given to the other beneficiaries; but they, after the payment of certain legacies, shared equally in her estate. *Held* to present such a doubt as to the testatrix's mental condition as to require the submission of the question to the jury.

3. SAME.

The fact that a testatrix has an insane delusion in regard to a person who is the natural object of her bounty does not invalidate the will, where it does not appear that such delusion affected the disposition of her property.

Appeal from surrogate's court, Delaware county.

A. Raymond Gibbs, the executor named in the alleged will of Mary Iredale, presented the same for probate. The probate was contested by J. George Lockwood and others. From a decree of the surrogate denying probate of the alleged will, proponent appeals. Reversed, and the issue of testatrix's testamentary capacity ordered submitted to a jury.

Argued before PARKER, P. J., and KELLOGG, EDWARDS, MERWIN, and SMITH, JJ.

Marion M. Palmer, for appellant.

Edwin D. Wagner, for respondents.

EDWARDS, J. Mary Iredale died at West Davenport, in Delaware county, February 12, 1892, aged 77 years, leaving an instrument purporting to be her will, dated November 13, 1891. She was a widow, and her nearest relatives were nephews and nieces. Shortly after her death the proposed will was offered for probate, and objections thereto were filed by J. George Lockwood and George B. McRoberts, nephews of the decedent, and two of the legatees named in the will. The grounds of their objections were that the instrument was not subscribed, published, and attested in conformity with the statute; that the decedent, at the time the instrument was executed, was not of sound mind, memory, and understanding; and that it was procured by fraud, coercion, and undue influence. In the petition for the probate of the will the value of the personal property is stated as not exceeding the sum of $20,000, and the value of the real property the sum of $6,000. With the exception of $100 given in trust for the purpose of keeping her burial lot in order, all of her property is given to her nephews and nieces, 13 in number. After legacies to these nephews and nieces ranging from $100 to $2,500 each, and amounting in the aggregate to $8,000, she gives the remainder of her property to be equally divided between the legatees named in the will, share and share alike. She appoints A. Raymond Gibbs executor of the will, and directs him to sell her real estate. The proceedings in the surrogate's court were continued for about four years, and a large amount of evidence was introduced upon the part of both the contestants and the proponent. The testimony of the subscribing witnesses showed that the proper formalities for the due execution of a will had been observed. But little, if any, evidence was given upon the issue of undue influence, and the surrogate found that none had been exerted. Almost the entire evidence related to the testamentary capacity of the decedent, and on that question the surrogate found adversely to the proponent, and adjudged that probate of the instrument as the will of Mary Iredale, deceased, should be denied.

The decedent was born in England, and, although she could read and write, it is evident that her early opportunities for education had been somewhat limited. She came to this country in 1840 with her parents, who settled in West Davenport. In her earlier life she was a weaver in woolen factories in Schenectady and Troy, and was married at 40 years of age to George Iredale, with whom she lived at Davenport until he left her, in about 1872, and returned to England, where

within about 2 years he died.  Thereafter she, her sister Mrs. Lock
wood, and her unmarried brother, Jonathan Roberts, lived together at
Davenport until the death of Mrs. Lockwood in 1884, after which she
lived with her brother Jonathan until his death, on December 26,
1890.  In the following spring she went to live with her nephew J. G.
Lockwood, where she remained until September, when she returned to
her own home, where she lived until her death, in the following
February.  Prior to 1884 she had a slight attack of paralysis, and
thereafter walked with a cane or crutch.  In 1890 there was a recur-
rence.  Her lower limbs were paralyzed, and there was some disa-
bility of her hands and arms, so that thereafter, until her death, which
was the result of another attack, she remained partially helpless.  In
the summer of 1891 she was ill from a complication of diseases.

I have carefully examined the voluminous evidence in this case,
and it fails to satisfy me of the correctness of the determination of
the surrogate.  Testamentary incapacity cannot be inferred from
advanced age or enfeebled condition of mind and body.  If the dece-
dent had sufficient intelligence to comprehend the condition of her
property, her relations to those who were the objects of her bounty,
the nature and consequences of her act in executing the will, and if it
was her free act, it must be held to be valid.  In re Lewis' Will, 31
Hun, 213, 30 N. Y. Supp. 675; Horn v. Pullman, 72 N. Y. 269; In re
Snelling, 136 N. Y. 515, 32 N. E. 1006.  Reading the evidence in the
light of this principle, my mind is not left free from doubt.  The
specific and unaided directions of the decedent for the preparation
of the will, and all the circumstances attending its execution, unmis-
takably evince her testamentary capacity.  Mr. Gibbs, who drew the
will, and was one of the witnesses, had been for 30 years in the prac-
tice of the profession of law, and had been acquainted with the
decedent for 20 years.  About 2 or 3 weeks before the will was execut-
ed she sent for him to come to her house, and told him that she
wanted to make her will; that she had times when she was not feeling
well, and, if anything happened to her, she wanted to have her will
made,—and wanted to know if she could change it after it was made,
to which he answered that she could.  He asked her how she wanted
it.  She then proceeded to give him the names of her nephews and
nieces to whom she desired to give legacies, the amounts to each,
the specific articles of property to some, her reasons for some of the
gifts, and then said she wished the rest of her property to be equally
divided among the legatees she had named, and told him that she
wanted him to be the executor.  Mr. Gibbs made a memorandum in
accordance with her directions, and she asked him to prepare the
will and bring it to her, and said that if she wanted to make any
changes, she would make them.  On November 13, 1891, at about 9
o'clock in the forenoon, Mr. Gibbs called upon her with the will which
he had prepared, and which he read over to her.  She said that she
wanted some changes made in some portions of it, and told him what
they were; said that, in addition to the articles given to Mary Blundel,
she wished to give her a set of silver teaspoons which used to belong
to her mother; wanted to change the sum to the children of Mary
Tallmadge from $500 each to $250 each, and said she thought $250

each would be sufficient; changed the amount to George Rose from $250 to $500; changed the amount to Anna Moak to $500; increased the amount to Jane Eckler from $400 to $500. In the prepared will there was no provision for a burial lot, and she said that she wanted to have something given, so that the lot would be kept up, and wanted it so fixed that the interest could be used every year; said that there were no other relatives to whom she wanted to give any legacy. On that occasion she spoke to him about some business matters to which she wished him to attend, brought a note and a mortgage for him to make a computation, and inquired about a certificate of deposit which she wished exchanged, and the number of which she recollected. After Mr. Gibbs had completed his memorandum of the changes which she desired to have made in the will, he returned to the hotel, drew a new will in accordance with her last instructions, and returned with it to the decedent's house, where it was executed by her in the presence of Mr. Gibbs and a neighbor, Mr. Battershall; she sitting by the table and subscribing her name. At that time she could walk by leaning on a chair and shoving it.

It is claimed by the contestants that for nearly two years prior to the execution of the will the decedent was mentally incompetent, and their evidence was largely directed to the proof of that fact; but the undisputed evidence is that during that period, and down to the time of her death, she, with some advice and assistance, managed her own property; transacted business with the man who worked her farm on shares, and with others; paid her help; attended to her taxes; read the newspapers; conversed with her friends and acquaintances about what she had read; talked about her relatives, and who and where they were, and frequently wrote to some of them; and, except on one occasion, remembered her friends and acquaintances who called upon her. Among these letters were two to her niece Mary J. Blundel, who lived in Nevada,—one dated May 4, 1891, requesting her to come on to take care of her, and saying, among other things: "I shall have to make a will, for I am in a bad way. I am afraid of another shock. Then you will all share alike, and I want to get the most;" the other dated July 7, 1891, inclosing a draft for $100 to pay her expenses in going to Davenport, giving her specific directions as to the proper route, and informing her of the time of the arrival of trains at Davenport in the forenoon and afternoon. Quite convincing evidence of her comprehension of her property is a memorandum in her handwriting found in her pocketbook after her death. It does not appear at what time this memorandum was made by her, but it must have been after April 12, 1891, as it refers to a certificate of deposit of that date. She had been accustomed, instead of having a bank account, to take certificates of deposit from the bank. This memorandum reads as follows:

"This for my heirs, to tell what is in the banks at Oneonta: Wilbur National Bank, December 10, 1890, 3,366.73; April 12th, at Wilbur Bank, 1.738.-91; to the First National Bank of Oneonta, 1,189.94; Wilbur National Bank, Oneonta, Nov. 3, 1890, 850 dollars. At Wilbur Bank, Oneonta, 1891: March 9, 1891, deposited 2,000, No. 35,579; deposited March 9, 2,000, No. 35,580; deposited March 9, 2,700. Deposited at the First National Bank, Oneonta, Feb. 13, 1891, 232.42, No. 20,276."

On the trial the certificates of deposit mentioned in this memorandum were produced, showing that the memorandum was correct as to the amounts deposited; also, as to the dates, and as to the numbers of certificates, where the numbers are given. For a woman of her years, infirmities, and inexperience, this memorandum is somewhat remarkable for its accuracy, and is convincing, I think, of more than ordinary competency.

The only expert testimony on the part of the contestants is that of Dr. Gertrude Peck, the physician who attended the decedent in her illness in 1890, in 1891, and at the time of her death. She testifies that she does not think the decedent was capable of understanding ordinary business transactions; but it does not appear that she had any knowledge of any business transactions by the decedent, except two with herself in the settlement of her bills, the first of which appears to have been intelligently done, while the latter is subjected to the physician's criticism by reason of the fact that the suspicious, penurious old lady questioned whether some of the visits charged for in the bill were not for occasions when the physician called upon her socially rather than professionally. She says that the statements made to her by the decedent in respect to her various difficulties were correct and intelligent. A number of witnesses testified as to the utterances and conduct of the decedent on different occasions during this period of two years, and their testimony has a more or less serious bearing upon the question of the mental capacity of the decedent. She frequently used profane expressions, and asserted that she would have to go to the poor house; but some of the proponent's witnesses, who had known her many years, testified that these were her frequent expressions in her earlier life. Frequently she threatened to kill herself, but there is no evidence of any attempt ever made by her to carry her threats into execution, and there is much reason to believe that they were the idle utterances of a feeble, irritable old woman. If the testimony of two witnesses is credible, she expressed apprehension on some occasions in the summer of 1891, while living with J. G. Lockwood, that there was poison in her food, and declined to eat it. There is much other evidence in the case bearing upon the mental condition of the decedent, but the conclusion which I have reached as to the proper disposition of this case makes a further analysis or discussion of such evidence unprofitable. A criticism, however, may be made upon the testimony of Josephine Lockwod, the wife of the contestant, and one of his principal witnesses on the trial, as illustrating the apparent change in her opinion since January 11, 1891. On that day she wrote a letter to her husband's sister, in Dakota, in which, referring to the decedent, she said: "She is not capable of transacting business. Her mind is clear and strong, but you know she depended upon Uncle Jont to transact the business, but yet she knows how it all is." A further criticism might not improperly be made upon the changed opinion of the contestant J. G. Lockwood in respect to the mental condition of the decedent. On December 31, 1890, he wrote to his cousin David Roberts, informing him of the death of the decedent's brother Jonathan on the 26th inst., and in referring to the decedent says, "She is unable to walk or help

herself much, but otherwise is better than she was a year ago;" and again, on May 22, 1891, he wrote a letter to his cousin David Roberts, in answer to one making inquiry in regard to the decedent, in which he said, "Her health is quite good for her, although she thinks that she is not going to live long." He further says, after making a statement in regard to the penuriousness of the decedent, "I make this statement to disabuse your mind, if you have any idea that Aunt Mary is not capable of transacting her business." It is possible that the change in his opinion may be ascribed to the fact that he then believed that his Aunt Mary would die intestate, as in the same letter he says of her, "Neither do I believe she will make any disposition of her property." It is a contention of the contestants that the decedent had an insane delusion in respect to the contestant J. George Lockwood, but this is unsupported by the evidence. Furthermore, it is only when the will is the result of an insane delusion that it is invalidated. In re White, 121 N. Y. 406, 24 N. E. 935; Dobie v. Armstrong, 160 N. Y. 584, 55 N. E. 302. If the decedent had such a delusion in regard to the contestant, it does not appear that it affected the testamentary disposition of her property. In three-fourths of the estate he shares equally with the other nephews and with the nieces named in the will, and the reason of the decedent for giving to her niece Mary J. Blundel more than to any of the other legatees was that Mrs. Blundel had kindly yielded to the solicitations of the decedent to leave her family in Nevada, and come to the decedent's home to care for her in her advanced age and infirmities.

We are not satisfied with the conclusion reached by the surrogate as to the testamentary capacity of the decedent, and on that subject there is sufficient doubt to make the case a proper one for a trial by a jury. In re Drake's Will, 45 App. Div. 214, 60 N. Y. Supp. 1020; In re Coe's Will, 47 App. Div. 181, 62 N. Y. Supp. 376. The decree appealed from should be reversed on the facts, and a new trial should be had by a jury, at a trial term of the supreme court in Delaware county, of the questions of fact to be stated in the order, with costs of the appeal to the appellant, payable from the estate.

Decree reversed on the facts, and a new trial ordered by a jury, at a trial term of the supreme court in Delaware county, on the questions of fact to be stated in the order, with costs to abide the event. Order to be settled on notice by EDWARDS, J. All concur; MERWIN, J., in the result.