### In re BENNETT'S WILL.

(Surrogate's Court, Delaware County. February 5, 1912.)

1. WILLS (§ 55*)—WILL CONTEST—SUFFICIENCY OF EVIDENCE—MENTAL CAPACITY.

　　Evidence *held* to show that testatrix had sufficient mental capacity when she executed the will sought to be probated.

　　[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–161; Dec. Dig. § 55.*]

2. WILLS (§ 166*)—WILL CONTEST—UNDUE INFLUENCE—SUFFICIENCY OF EVIDENCE.

　　Evidence in a will contest *held* to show that the will was not executed through undue influence exercised upon testatrix.

　　[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

In the matter of the probate of the last will of Sarah J. Bennett, late of Franklin, deceased. Judgment of probate.

H. C. Stratton, for contestant Amelia Betts.

L. F. Raymond (C. L. Andrus, of counsel), for proponents.

GRANT, S. [1, 2] Sarah J. Bennett, the decedent, died at Franklin, N. Y., June 13, 1910, leaving her surviving a sister, Amelia Betts, two nieces and one nephew, children of a deceased sister, and leaving a last will and testament, executed April 29, 1910. At the time of the execution of the will she was possessed of personal property amounting to $2,500. On the same day and prior to the execution of the will, the testatrix entered into a contract by which she transferred to George E. Armstrong and wife all her property except about $200, her personal clothing, some keepsakes, household effects, etc., which she desired to go to some personal friends and neighbors; the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

consideration for the transfer being that they should care for her during her lifetime, pay the expense of her burial, cause a marker to be placed at her grave and the grave of her deceased husband, etc. After the execution of this contract, she made her will in which she gave all her property to George E. Armstrong and wife. The Armstrongs were no blood relation to the deceased. Mrs. Armstrong was a niece of her deceased husband.

The witnesses to the will were Lewis F. Raymond, of Franklin, who drew the will, and who is the attorney for the proponent herein, and Melissa Munson, a friend and neighbor of Franklin.

Mr. Raymond testified that he resided at Franklin; knew testatrix all his life; did more or less professional business for her; had the first conversation with reference to the execution of the contract and will the morning of the execution of the will at her home. She had sent for him to come. When he went in, she said, "Hello, Lou." He asked her what she wanted to see him for, and she replied she had been thinking the matter over of making arrangements with Mr. and Mrs. George E. Armstrong to come there and take care of her. She said she had been figuring up her property, and said she had about $2,500. He asked her what it consisted of, and she replied she had a mortgage on the Virgil Ogden property amounting to $1,400 or $1,500, and a mortgage on the Southard farm, town of Sidney, for $1,000, and about $45 in cash besides her household goods and effects. She said it was costing her about $50 a month to be taken care of. She was hiring Lewis Bennett to stay nights and a woman daytimes to do her housework, and, if she lived a good many years, her money would be all used up. She said she had offered to give George Armstrong and his wife her property if they would come and take care of her as long as she lived, and bury her and put up a headstone or markers at her grave and her husband's. She said they were nearest to her of any one, and asked Raymond what he thought about it. He replied it was a lottery how long she would live; that, if she lived a number of years, it would be a good investment for her to do it. It insured her good care. Raymond says he asked her if she had talked with them about it, and she replied she had sent word by Charles Bourne that she wanted them to come and take care of her, and she would give them her property. She said there were certain keepsakes she wanted some of her friends to have. She wanted Mrs. Munson to have all her wearing apparel. She wanted Mrs. Munson also to have some rugs that she had formerly given the testatrix. An old-fashioned pair of blankets she wanted Libbie Briggs, a friend who had lived near her, to have. A large gilt mirror she wanted Sarah Chamberlain, a former neighbor who had been kind to her, to have. These things she said she wanted to give away as keepsakes to her friends; but the remainder of her property she was willing to give Mr. and Mrs. Armstrong if they were willing to come and take care of her, and bind themselves to do it, and she wanted the property fixed some way so they would be certain to have it when she was gone.

Raymond asked her what security she would require if she gave them the property, and she said, if Etta Armstrong's mother who lived near would guarantee the fulfillment of it, she would be willing to do it. She also suggested she would want to reserve something to pay her subscription to the church, and also have a little spending money that she might give to her friends to use without asking the Armstrongs for it. Raymond asked her how much she wanted to keep out, and she replied about $200, and wanted to know how it could be arranged. Raymond suggested he would pay her $200 on the mortgage on the Southard place. She said she did not want to take it, as she wanted it on interest. Raymond then suggested he would give her his note payable on demand, and indorse it on the mortgage, and it was arranged that way. A note was given and indorsed on the mortgage by Raymond. She then told him to prepare a contract and a will to fix it so that whatever she had left that she did not give them that day they would get at her death. Raymond then went to his office, drew the contract, and came back after dinner. The testatrix was sitting in her chair by the window. The contract was read over to her. She asked particularly about the guaranty, if Raymond thought it was strong enough to hold in case Mr. and Mrs. Armstrong should die or fail to carry out the terms of the contract. Raymond assured her he thought it was. The will was drawn at the house. The contract was first executed, then the will. Both papers were signed by her. She asked Raymond and Mrs. Munson to sign as witnesses, which they did. The will having been executed under the direction of an experienced attorney, there is not much doubt but that the requisite formalities were complied with, although the memory of the other subscribing witness is somewhat vague as to what transpired.

Melissa Munson, the other subscribing witness, testified she lived at Franklin, was 70 years of age, knew the testatrix from childhood, was with her a few days about the time of the execution of the will because her girl was absent. She was shown the will, and asked if her name appeared upon it. She replied she did not remember making it, but her name was there. She was asked if she saw Sarah J. Bennett sign her name to it; and she replied:

"I saw her write on the paper, but did not know what she wrote; saw her sign her name only this once, signed her name, saw Raymond write, did not know what he was writing."

A number of witnesses were sworn in behalf of the proponents, tending to show that the testatrix at or about the time of executing the contract and will was of sound mind and memory and competent to make a will.

It is claimed by the contestant that the testatrix at the time of executing the contract and will was not of sound and disposing mind and memory, and was not competent to make a valid testamentary disposition of her property, neither was she competent to make the Armstrong contract; that both were the result of undue influence; that in April, 1908, she suffered a shock of cerebral apoplexy; that

the following summer she had a fainting spell, whether it was a second shock or the result of eating some berries is not clear; that on February 20, 1910, she had another shock, and a short time before her death she had still another shock which caused her death June 13, 1910; that she did not leave her house more than once or twice after the shock in 1908, and never unless attended; that after 1909 she never walked about the house without assistance or by the aid of a chair; that at the time of the shock February 20, 1910, she was unconscious for a while and then in a stupid condition for a considerable time, and thereafter never left her bed without assistance; that on the 29th day of April, 1910, she executed a contract and two assignments of mortgage, whereby she, in effect, absolutely transferred all of her property to the proponents of the will, except $200 and a few small household chattels of small account; that this contract purported to have been made in consideration of future support, funeral and burial expenses, etc., and, notwithstanding she thereby divested herself of her property, she thereafter executed the alleged will; that on that day she ate no breakfast, no dinner, and a small quantity of hot water and toast for her evening meal; that at this time she was unable to dress herself or care for herself in any way; that after the shock of February 20, 1910, she had tremor, paralysis, contraction or inequality of the pupils, loss of reflexes, difficulty in articulation, face expressionless, one half being blank the other half being drawn and exaggerated physical condition of an insane person; that there was paralysis of the left hand, foot, and left side, a loss of memory, and a weakened condition of the brain; that she had aphasia and dragged one foot; that she performed no household duties, and was under the constant care of a nurse and attendant; that the corners of her mouth were drawn; that she had all the symptoms of melancholia; that for nearly two years before her death she was absolutely unable to control her bowels, and that such condition was not attended on her part by any feeling of shame or embarrassment, but apparently unknown or absolutely disregarded by her; that after the February shock it was a daily and nightly occurrence for her to soil herself, her clothing, and bedding; that this occurred five or six times, possibly a dozen times a day, with no apparent sorrow or shame; that she was subject to fits of depression and morbidness; that she repeatedly said over and over again that she had not sufficient property to support her, that she would have to go to the county house; that she wanted to be carried out and thrown on the "dung pile," and begged to have that done; that these expressions were used by the testator on the day of the execution of the alleged will; that on the same day after they had gone she threatened to cut her throat with a penknife, and said when prevented from doing so, "Why can't I do it this minute?" that the same day, while her attendants was trying to get her in bed, she said, "O, my head," and fell down on the floor in a heap, where she lay until assistance was summoned; that shortly after this transaction when several people were in the room, and without any excitable cause, she began to count and counted several times nearly a hundred, apparently with her eyes shut, and, in ad-

dition to counting, hollowed, saying she wanted to go to the county house, and be carried out on the manure pile; that this she said a great many times and most of the time crying; that before the will was executed, and on the 'same day, she said to Raymond, in speaking of the Armstrongs, "they were nearest to her of any one," showing she had overlooked her own sister and other blood relatives.

There was a large number of witnesses sworn in behalf of the contestant, and some evidence given tending to establish many of the above recited facts.

If the evidence of the witness. Raymond is true, and the testatrix on the day of the execution of the will gave the directions for the business transacted that day and explained the reason therefor describing the amount and character of her property as testified to by him, she was in my opinion, applying the rule laid down in Matter of Iredal, 53 App. Div. 45, 65 N. Y. Supp. 533, competent to make a will, although the case is not free from doubt, as the evidence as to her physical condition about the time of executing the will is conflicting; still, basing my conclusions upon the evidence of the witness Raymond as to what was said and done at the time of the execution of the will, I am of the opinion she comprehended the condition of her property, her relation to those who were the objects of her bounty, the nature and consequences of her act, and that it was her free act, and for the foregoing reasons admit the will to probate as a valid testamentary disposition of her property.

Costs to be adjusted and decree settled upon notice.