That testatrix was a believer in Christian Science, founded on religious convictions, does not show a want of testamentary capacity.

2. SAME—INSANE DELUSION.

A sincere believer in Christian Science left her home because she believed that her sisters therein persecuted her for her peculiar views, to which they were strongly opposed. She revoked a former will that she had made, and gave the bulk of her estate to a Christian Science church. *Held* not to show testatrix subject to an insane delusion, though she may have exaggerated the conduct of her sisters.

3. SAME.

That a believer in Christian Science ascribed to it certain miraculous powers, and credited it with a cure of a disease to which she was subject, does not thereby show her subject to insane delusions avoiding her will.

4. SAME—UNDUE INFLUENCE.

Where the beneficiary of a will is not of the blood of testatrix, and occupies a confidential position as to her, the presumption of undue influence is one of fact, which may be overcome by evidence.

5. RELIGIOUS SOCIETIES—CHARITABLE BEQUESTS.

When a religious society was incorporated under the act of April 5, 1813, and the acts amendatory thereof, and was not made subject to Laws 1848, c. 319, § 6, which provides that a bequest to a corporation organized under such later act should be invalid unless the will giving the bequest was executed at least two months before the death of the testatrix, it may take a bequest under a will so made.

In the matter of the contested will of Helen C. Brush, deceased. Decree rendered.

William H. Rand, Jr., George W. Delano, and William L. Clark, for petitioners.

John M. Bowers, Charles P. Latting, and Charles C. Burlingham, for contestants.

FITZGERALD, S. Helen C. Brush died of consumption in New York City on the 7th day of July, 1900, under 50 years of age. The nearest relatives whom she left her surviving were three sisters,—Mrs. Findlay, Mrs. Southard, and Miss Mary H. Brush,—and a brother, James E. Brush. On the 24th day of May, 1900, she executed a will, under the terms of which Mrs. Southard, who is named as executrix, and who is the proponent herein, is given a legacy of $10,000, and the testatrix's other sisters and her brother are each given the sum of $1,000. After making various other pecuniary legacies, the decedent gives the remainder of her estate (which, approximately, is of the value of $20,000) to the First Church of Christ, Scientist, of New York City. The will is contested upon the ground of testamentary incapacity, and upon the further ground of undue influence alleged to have been exercised by agents of the residuary legatee.

The decedent was an unmarried woman. Her property came to her principally from the estate of her father and of that of her deceased brother, in which estates her sisters and surviving brother shared equally with her. She lived with her parents until they

died, and in the year 1889 took up her residence in a house on Forty-Seventh street, in the city of New York, which she and Mrs. Findlay owned in common, and wherein she continued to live until within 18 months of her death. The household, during the period of about 10 years, consisted of the decedent and her sisters, Mrs. Findlay and Miss Mary H. Brush. The decedent had mental gifts and a culture of more than ordinary character. She was interested in literature and art, especially devoted to music, and had a strong sense of humor. She was tender-hearted and kindly in her intercourse with others, and hence had many friends, who had formed strong attachments for her. She was actively and loyally devoted to the tenets of her faith. It would seem that a tendency to consumption was hereditary in her family, her mother and brothers and sisters having died therefrom, and, in or about the year 1886, she herself was stricken with this disease. She placed herself under the care of a physician, who treated her for several years, but she believed that her condition continued critical. We find, from a letter written thereafter by her to an acquaintance, that it was at this time—about the year 1888—that she became interested in the religious belief known as "Christian Science." She tells this acquaintance that anything in the nature of a faith cure had always been regarded by her as "an ignorant superstition," but that, after hearing a "not particularly" able lecture upon this subject, she became impressed with what she terms "a plain statement of an honest experience"; that she then read some of the literature that pertained to this belief, "literature," she says, "without the least pretense of literary merit, but back of it all I saw a truth of vast significance." She thereupon attended lectures, read books upon the subject, and, in fact, became converted to the beliefs of Christian Science. Thereafter her condition improved, and, eventually, she, to all appearances, recovered her health, attributing her recovery to the powers of the belief which she had embraced to heal suffering and disease. From that time on she lost all faith in physicians, and never thereafter permitted them to treat her. Although the testatrix thus became a Christian Scientist 12 years before her death, and although her interest in this belief did not wane, yet she was not impelled to become an active church member until some 7 years afterwards. In September, 1895, she applied for class instruction to a Mrs. Stetson, who was at the head of the First Church of Christ, Scientist, occupying the position known as "first reader." It seems that she informed Mrs. Stetson that her sister Mrs. Findlay believed in "mental science," so called; whereupon she was told that mental scientists were opposed to Christian Science, and that she should not, as yet, study the matter, as the opposing views that would result might prove unpleasant for her. Shortly afterwards the decedent was taken seriously ill with pneumonia in both lungs. Her sisters became greatly alarmed, and, knowing how futile it would be to attempt to have a physician see her, they gladly carried out her wishes to be treated through the medium of Christian Science. After receiving the attendance of several healers of that faith, they obtained the services of Mrs. Stetson. In a short while the de-

cedent apparently recovered from her illness, and there can be no doubt that, as in her previous illness, she implicitly believed that she had fully recovered, and that her recovery had been effected entirely by Christian Science. From this time on she became devotedly attached to this religious belief. During the period of her convalescence she procured the services of a Miss Duncan, a Christian Scientist, to read books on this subject with her. She evidently found in Miss Duncan a congenial companion, whose enthusiasm and attachment for the belief they held in common were as great as her own, and so it came about that a very ardent friendship sprang up between these two women, as a result of which Miss Duncan lived with the decedent until the latter's death. In the early part of the year 1896 the testatrix joined the First Church of Christ, Scientist. She took class instruction, given to those who desired to perfect themselves in the teachings of Christian Science; she became a constant attendant at the services; she went to weekly meetings, where persons related how they had been cured of illness through this faith, and where she herself testified as to having been healed, as to her gratitude and affection for Christian Science, and as to the strength and happiness which she derived therefrom; and she both gave and loaned to this church substantial sums of money. In the month of December, 1898, she left her home on Forty-Seventh street to pay a visit, and while away, and on the 16th day of January, 1889, she wrote a letter to her sisters Mrs. Findlay and Miss Mary H. Brush, wherein she dwelt at length on the unhappiness of her home life, based chiefly on the hostile criticism which, she averred, was directed against her religious convictions, and wherein she expressed her determination to no longer reside with her sisters, saying that it was her belief that the relations of all of them would be happier apart, and that this proposed step seemed wise and right to her, and was not taken in any spirit but that of love. I shall have occasion, later on, to refer to the answer to this letter. This determination of the decedent was fully carried out, and from that time on she lived apart from these two sisters, with Miss Duncan as her almost constant companion. In the month of May, 1900, her health apparently began to fail, and it was then that she made the will here in contest, destroying a former will made some 11 years previously. She again relied on Christian Science to heal her, and Mrs. Stetson again treated her, but this time without effect. She was in the last stages of consumption, and within a few months she died, without having summoned medical aid at any time, a firm believer to the end in the wonderful powers which she attributed to the religion which she had embraced.

The above recital indicates sufficiently the main incidents in the life of the decedent which led up to the making of her will, and I shall now proceed to consider the issues raised by the parties herein. The circumstances surrounding the preparation and execution of the will have been testified to in much detail. It appears, from the testimony of Mrs. Stetson, that she called on the decedent on the morning of May 22, 1900, in pursuance of a request of the latter. The decedent requested her visitor to confer a favor on her, and

then told her that she wished a will prepared, and, in answer to Mrs. Stetson's inquiries as to the necessity of such a thing, decedent said that she had had two hemorrhages, and thought it best to have a will made. She then transcribed the names of the persons whom she wished to be her beneficiaries from a memorandum book to a blank card, which she read aloud to Mrs. Stetson. One of the names on this card was that of her visitor, with the figures $5,000 placed opposite thereto. Mrs. Stetson refused absolutely to accept this legacy, and the testatrix was persuaded finally to omit her name. Mrs. Stetson was then requested to take this card to a Mr. Delano, an attorney, who was also a trustee of the Christian Science Church, and have him draft the will and attend to its execution. This she did immediately. Mr. Delano, who corroborates Mrs. Stetson's testimony as to the fact of his receiving his instructions from this card, at once drafted the will, and on the afternoon of the same day—that is, May 22d—called on the decedent with a Mrs. Holden, a Christian Scientist. The will was read by the decedent, who expressed her satisfaction therewith, and it was thereupon duly executed; Mr. Delano and Mrs. Holden acting as subscribing witnesses. That night the decedent, in thinking over the transaction of executing her will, became very much worried as to whether she had omitted the name of her sister Miss Mary H. Brush as a legatee. On the next day she made inquiries, and she communicated with Mr. Delano. As a matter of fact, this name had been omitted, and Mr. Delano was directed to remedy this oversight. He prepared another paper identical with the first one, with the exception that Miss Mary H. Brush was given a legacy of $1,000, and this new paper was, on the 24th day of May, executed, with the same subscribing witnesses. On the day following the decedent destroyed her old will made in the year 1889. Under its terms, as Mr. Delano testifies, it appears that Mrs. Southard was given $8,000, and the contesting sisters and brothers $2,500 each. Many other legacies were also made. It does not appear to whom the residuary estate was bequeathed. Both Mr. Delano and Mrs. Holden had known the decedent for some years, and, indeed, the latter was one of her friends. The testimony of Mrs. Holden, as to the factum of the will and the mental capacity of the testatrix at the time of its execution, was clear and convincing. The decedent, then, was not confined to her bed, but was up and about the room; she was bright and cheerful; she conversed intelligently with Mrs. Holden on general subjects; she certainly, so far as all appearances went, was perfectly rational and under no restraint whatever. She was undoubtedly cognizant of the amount and nature of the property which she had to dispose of, and the omission of her sister's name, which she caused to be supplied, would strongly show that she clearly had in mind all of those who had claims upon her bounty. It must also be added that she at no time showed any lack of prudence in managing her business affairs, and, in fact 10 days before she died, she engaged in a transaction in which her sister Mrs. Findlay was interested. Certainly, so far as concerns the factum of the will, an entirely clear and strong case was made out.

It is insisted, however, that the testatrix, at the time she exe-

cuted her will, was laboring under various insane delusions, which were the sole or controlling cause that induced her action. One of these delusions is said to have been her belief that she was being persecuted by her sisters Mrs. Findlay and Miss Brush, and another that she believed that certain marvelous things—such as the ability of a person to live after extracting all of his blood from his body— could be accomplished through the powers of the religion which she professed. Several experts were called, who testified that, in their opinion, these beliefs were insane delusions, and demonstrated a lack of testamentary capacity, and one of them went so far as to hold that the belief in Christian Science itself was an insane delusion. The record is replete with testimony upon this subject, and the workings and teachings of this religious belief have been gone into most minutely and elaborately. Its adherents believe that matter has no existence except as a manifestation of mind; that the divine mind is all-controlling; that the human mind, by becoming clean and purified, can, to a degree, realize and employ the powers of the divine mind; that all sickness and bodily ills are merely a species of sin, error, or evil, and exist only in the apprehension of the human mind, and are in nowise phenomena of matter; that the divine mind has the same power to relieve one of such sin or error, manifested in the form of disease, as it has to expel any other unclean or evil thought; and that the human mind, if it can only so perfect itself as to partake in sufficient degree of the omnipotence of the divine mind, also will be able to throw off and rid itself of disease. These beliefs are embodied in a book called "Science and Health," which purports to derive them from the teachings of the Bible. Demonstrations of these teachings are attempted by Christian Scientists, who are known as "healers," and who treat disease without the use of any material means whatever; the treatment, as one of them testified, being "always a prayer." They do not claim to cure all bodily ills, but they attribute their failures, not to the nature of the illness, but to the imperfect realization by the healer of the divine mind, since to them the possibilities of Christian Science are infinite. It is their belief, on the other hand, that, when a patient does recover, the healer has realized sufficiently the truths as taught by "Science and Health" and the Bible, and has, by his understanding of the power of God, as thus demonstrated by Christian Science, been able to remove the imperfections of which the disease was the result. It is therefore evident that, however opposed these teachings may be to the beliefs or notions of others, they are founded on the religious convictions of those professing them. This being so, the court cannot say that those persons are mentally unsound. The truth or falsity of a religious belief is beyond the scope of a judicial inquiry. In re Keeler's Will (Sup.) 3 N. Y. Supp. 629. Thus, the court has often been asked to pass upon the falsity of Spiritualism, and to hold that a follower of this faith, which, like Christian Science, is contrary to the convictions of most men, was of necessity laboring under an insane delusion; but it has uniformly refused so to declare or hold. In re Halbert's Will, 15 Misc. Rep. 308, 37 N. Y. Supp. 757; Robinson v. Adams, 62 Me. 369, 404. There can be

no doubt that the decedent's belief in the religion which she had adopted, and her strong adherence to the church wherein she worshipped, were the cause of the making of her will. Consequently, the only question which concerns us is as to the effect of this belief on her mind, the belief itself not being any evidence of insanity. Did it unseat her judgment, dethrone her reason, and thus deprive her of capacity to make a will? If it did; if, by reason of the effect of this belief on her mind, she became the victim of insane delusions, from which her will resulted,—then it follows that the contestants must prevail. Taylor v. Trich, 165 Pa. 586, 608, 30 Atl. 1053, 44 Am. St. Rep. 679; Orchardson v. Cofield, 171 Ill. 14, 30, 49 N. E. 197, 40 L. R. A. 256, 63 Am. St. Rep. 211; In re Beach, 23 App. Div. 411, 419, 48 N. Y. Supp. 437. In this connection, it should be borne in mind that while, generally speaking, an insane delusion is a demonstrably false belief, founded on supposed facts which really have no existence, but as to the falsity of which the person laboring under the belief as claimed cannot be convinced, yet, as the court of appeals has said, "if there are facts, however insufficient they may in fact be, from which a prejudiced, or a narrow or a bigoted, person might derive a particular idea or belief, it cannot be said that the mind is diseased in that respect." And it matters not whether such idea or belief be utterly ridiculous or illogical; it is still not evidence of insanity. In re White, 121 N. Y. 406, 24 N. E. 935. There can be no doubt that the decedent used the word "persecution" in describing the conduct of her sisters towards her. Indeed, she told Mrs. Holden that it was because of the persecution of her sisters that she desired to change her former will. As has been shown, the testatrix became fervently devoted to Christian Science after her recovery from pneumonia. While she did not, by any means, give up her interest in current topics, in literature and in art, and while she retained her great liking for music, yet she devoted far less time to these matters than formerly; her chief interest in life now being to study the religion which she had embraced, and to associate with its followers. Mrs. Findlay testified that she found no fault with her sister because of this change; still it must be inferred from the entire case that the decedent's sisters were greatly dissatisfied with her course. One of them had gone to the Christian Science Church for "amusement and entertainment." They both believed that the claims made by this belief were preposterous, and there can be no doubt that they often spoke in terms of ridicule of the decedent's faith, both to her and to her friends. The testatrix was a keenly sensitive woman, and her religious convictions were exceedingly strong and fervent. Such a person naturally would be wounded by unfriendly criticism of the mildest character directed against her. The decedent complained to several of her coreligionists because of the lack of sympathy that was shown by her family with regard to her religious belief. She seems to have been very much attached to her sisters, but she evidently felt that, by reason of the conflicting views which she and they entertained respecting the religion which she professed, she could not be happy or contented in their society or live in the same household with them. It has been pointed out that in Janu-

ary, 1899, the decedent finally wrote a lettter to her sisters in which she went over this trouble, and said that she would not return to them. Mrs. Findlay's reply to this letter is significant. She writes the decedent that the step thus taken by her is unloving and her criticism is unchristian; that there is no need of words or eloquence when the daily life shows coldness and lack of sympathy and interest; and that the past has shown how unwilling the decedent has been to look at these things fairly. The separation which ensued was by no means a severance of the other ties which existed between the testatrix and her sisters. They corresponded with each other in the most affectionate terms and sent one another gifts. Indeed, a genuine and deep-seated affection existed between them, the only cloud that darkened their lives being this difference as to religion. While, probably, the decedent entertained exaggerated notions as to the treatment accorded to her on this subject, yet, in the face of all of the facts disclosed, I fail to see how the conclusions she arrived at can in any sense be called an insane delusion or the result of one. There was certainly some continued opposition to her views, and, under the rule above enunciated, her belief that the conduct of her sisters amounted to persecution, while perhaps not justified, cannot be termed an evidence of insanity.

With regard to the other delusions which, it is claimed, affected the mind of the testatrix, it appears that on one occasion, in the winter of 1898, Dr. Ball, who had been her physician, requested her to answer certain hypothetical questions which he desired to ask her in connection with Christian Science, telling her at the same time that he did not care to discuss the subject with her. He then asked her several questions, as, for example, what she would do if a foreign body were imbedded in her eyeball, and she replied that she would go to a Christian Scientist who would remove the pain, so that it would make no difference whether the foreign body were in her eye or not. He also asked her what she would do if she were bleeding to death by having her leg cut off, or what effect it would have if the blood were extracted from her body, and she said that she would not die if her mind were in harmony with the divine mind. The next day Dr. Ball received a letter from the decedent which he destroyed, and wherein, it seems, she explained at length her views upon Christian Science, but, unfortunately, he could not remember its contents. It will be at once observed that the decedent was merely expressing her beliefs as to certain supposititious cases, and that no argument was used to show to her that she was in error. She was held down to almost categorical answers, and, although she afterwards gave her interrogator an explanation of her views, that explanation has been lost. It is fair to infer from what has been testified to as to the teachings of Christian Science that the decedent meant that, since everything was possible in her faith, life could be preserved even in the miraculous manner supposed, providing that in any given case the healer could adequately realize the powers of, and place himself in sufficient harmony with, the divine mind. There is nothing to show that the views involved in her answers to the doctor were acted on, and, if the belief in Christian Science itself is not

an insane delusion, I fail to see how mere convictions of the efficiency of its powers in supposed cases can be termed evidences of insanity. Nor will the decedent's repeated declarations that she had been healed of disease by Christian Science be termed an insane delusion. It is urged that she added to these declarations that physicians had abandoned her case, but the evidence is not at all convincing that she made such statements. Even if she had, it can well be explained by ascribing them to a proneness not unusual with people of magnifying events and occurrences with which they have been associated, especially if there have been present some elements of novelty or of strangeness or of personal peril or danger. So far as concerns this belief in her cure, she certainly had been ill, she appealed to Christian Science, and she believed she had recovered her health.

Upon a careful consideration of the voluminous testimony taken on this trial, I am of the opinion that the burden of proof on the issue of testamentary capacity, which is on the proponent, has been fully sustained, and that at the time of the execution of her will the decedent was of sound mind.

The contestants further insist that this will should not be probated for the reason that it was the result of undue influence exerted upon the testatrix by Mrs. Stetson and other Christian Science healers. In aid of this contention the rule is invoked that where a testator ignores the natural objects of his bounty, and gives to strangers, the proponent should come into court prepared to show that the will represents the unconstrained wishes of the decedent, and should furnish some proof besides the factum of the will, particularly if a former will, made while the testator was in good health, has been supplanted. In re Carland's Will (Sur.) 37 N. Y. Supp. 924; In re Way, 6 Misc. Rep. 484, 27 N. Y. Supp. 235; Tyler v. Gardiner, 35 N. Y. 559. The rule is also invoked that, where the beneficiary under such a will occupies a position of confidential relationship to the testator, a presumption of fraud arises. Marx v. McGlynn, 88 N. Y. 357, 371. Even if it be granted that this presumption exists in the present case, it is one of fact only, subject to being overcome by the evidence. In a case of the length of this one, involving the examination of nearly 40 witnesses, circumstances are very apt to crop out here and there which, when deftly welded together, appear to spell out a suspicion of fraud, yet which, when regarded in the light of all of the facts, become of little or no moment. I have given careful consideration to the argument of contestants' counsel, and have thoroughly examined the testimony upon which he relies, but I fail to find any substantial evidence tending to show undue influence. On the contrary, when all of the facts present are considered, the conclusion seems inevitable that no restraint whatever interfered with the expression of the decedent's testamentary intentions. So far as concerns Mrs. Stetson, it was shown that, excepting as the decedent met her in church as other members did, she saw very little of the testatrix socially during that time that she knew her, and, despite the earnest contentions of the contestants, I am convinced that she was entirely innocent of the fraud that has been

sought to be fastened upon her.  If undue influence existed, it must have been wrought through the medium of a conspiracy, in which various healers who attended the decedent, and particularly her friend, Miss Duncan, took part.  The testimony of these witnesses absolutely negatives the existence of any such conspiracy.  I was impressed with the truthfulness of their statements, and nothing that these women said or did in any wise indicates that any plan was formed or existed to coerce the volition of the decedent and to procure her to make a will.

The circumstances present in this case clearly show how it came about that the will in contest was made.  The sisters and brother of the decedent were not dependent upon her bounty.  Their property was equal to that inherited by the testatrix, and, so far as appears, they were as independently situated as she was.  During the last four years of her life the church which she made her residuary legatee became deeply rooted in her affections.  She felt that she owed to it a debt of gratitude, for she believed that it had given her new health and strength and happiness, and, feeling in this wise, she doubtless thought that she could best aid it in the promulgation of its teachings by giving to it the bulk of her estate.  She was, in my opinion, thoroughly aware of what she was about when she made this disposition, and she clearly knew the contents of her will, which was in absolute accord with her free and unconstrained intentions and wishes.  Whether her determination not to give her fortune to her family was unwise, whether the residuary legatee herein has deserved the affection and gratitude which the testatrix has so bountifully given evidence of, are not questions for this court to consider in arriving at its decision.  The decedent, being of sound mind and free from restraint, had the right to do with her own as she pleased, and her will must, therefore, be admitted to probate.

The contestants raise the question that the bequest to the First Church of Christ, Scientist, is void because made within two months of her death, contrary to the provisions of section 6 of chapter 319 of the Laws of 1848.  It seems that the certificate of incorporation of this church recites that the incorporators are desirous of organizing a religious society pursuant to the provisions of "an act of the New York legislature passed April 5, 1813, entitled 'An act for the incorporation of religious societies' (Laws 1813, p. 212), and to the several acts of said legislature amendatory thereof and supplemental thereto."  The contention is made that the act of 1848 is supplemental to that of 1813, and hence that the residuary legatee is subject to the restrictions contained in the former.  Section 6, referred to, has been held to apply only to corporations organized under the law of which it forms a part, unless where, by express statutory enactment, it has been extended to others.  In re Fitzsimmons' Estate, 29 Misc. Rep. 731, 62 N. Y. Supp. 1009; Hollis v. Seminary, 95 N. Y. 166.  It has also been decided that certain of the corporations to which section 6 pertains are religious corporations, although not so described in terms in the statute, and that an act subjecting a corporation to the provisions of law relating to devises and bequests to religious societies makes ap-

plicable to the corporation the provisions of the section mentioned. Stephenson v. Short, 92 N. Y. 433. The corporation to which is bequeathed the legacy in question is not expressly or constructively made subject to section 6 of the act of 1848, or the provisions of law in respect to devises and bequests to religious societies. The fact that certain of the corporations to which the act mentioned relates have been held to be religious corporations furnishes no adequate reason for contending or inferring that the legislature enacted section 6 as a supplement to the laws specially providing for the incorporation of religious societies, or intended its provisions to apply to such societies. As a result, the bequest in controversy, having been made to a corporation organized under the laws last referred to, is valid, and the legatee is entitled to take it. Submit findings and decree in accordance with this decision.

Decreed accordingly.