Argued March 16, modified April 7, rehearing denied June 2, 1914.

## WADE *v.* NORTHUP.

(140 Pac. 451.)

**Descent and Distribution—Rights of Expectant Heirs.**

1. A child, whether of the blood or by adoption, has no standing to assert or defend any interest which is expected hereafter in the estate of a parent who is still living.

**Deeds—Evidence—Conspiracy to Defraud.**

2. In a suit wherein it was sought to cancel a deed, evidence *held* not to show a conspiracy between relatives of the grantor to defraud her.

[As to when a deed is void in law for fraud, see note in 93 Am. Dec. 596.]

**Deeds—Validity—Mental Capacity of Grantor.**

3. If at the execution of a deed the grantor has sufficient mental capacity to comprehend the nature of the business in which he is engaged, the instrument is valid.

[As to contracts of insane persons, see notes in 15 Am. Dec. 361; 21 Am. Rep. 29.]

**Deeds—Validity—Capacity of Grantor—Evidence.**

4. Evidence in a suit in which it was sought to set aside deeds *held* to show that the grantor was possessed of ample mentality to fully and fairly comprehend the nature of the business in which she was

engaged when she gave the power of attorney under which the deeds were executed, and when they were executed by the agent.

**Principal and Agent—Power of Attorney—Construction.**

5. While a power of attorney authorizing the attorney to lease, let, demise, bargain, sell, remise, release, convey, mortgage, and hypothecate lands upon such terms and under such covenants as he shall think fit, does not technically authorize a gift, conveyances upon the consideration of $10 and $1, respectively, are within the letter of his authority.

[As to general rules respecting authority of agent, see note in 16 Am. St. Rep. 493.]

**Evidence—Parol Evidence Affecting Writings—Power of Attorney.**

6. Under Section 713, L. O. L., providing that an agreement reduced to writing is to be considered as containing all its terms, and there can be no evidence of those terms other than the contents of the writing except where a mistake or imperfection is put in issue or the validity of the agreement is the fact in dispute, and Section 717, providing that for the construction of an instrument the circumstances under which it was made, including the situation of the subject of the instrument, and of the parties to it, may be shown, in determining whether conveyances by an attorney in consideration of $10 and $1, respectively, were within the spirit of a power of attorney which did not authorize a gift, parol testimony may be admitted.

**Principal and Agent—Authority of Agent—Power of Attorney.**

7. Where a woman of advanced age, both before and after the death of her husband, spoke of an interest in unproductive land which she had inherited from her brother as a burden, and of her intention to give it to her other brothers and sisters, and there is no evidence of undue influence over her, conveyances by her attorney in fact in consideration of $10 and $1, respectively, were within both the spirit and letter of her power of attorney authorizing him to sell.

From Douglas: JAMES W. HAMILTON, Judge.

Department 1.    Statement by MR. JUSTICE BURNETT.

This is a suit by Henry Wade, Anna W. Spencer, John M. Wade, Annie Conlisk, Joseph R. Butler, Kate Flye and Mamie Smiley against Hazel Northup, and Isabel Ozouf, an incompetent person, by Hazel Northup, her guardian *ad litem,* having the double aspect of asking that a mistake in the description of land in the conveyances of plaintiff be corrected, and that an alleged unfounded claim of one of the defendants be declared void.

The mistake was denied by the defendants, and an answer in the nature of a cross-bill was filed by them to the effect that the deeds under which plaintiffs claim were obtained from the grantor, one of the defendants, by fraud, and while she was insane, and asking that those conveyances be canceled and held for naught.

The reply denied the allegations of fraud and insanity, and otherwise traversed the answer. From a decree setting aside the deeds in question, the plaintiffs appeal.                                    MODIFIED.

For appellants there was a brief and an oral argument by *Mr. Oliver P. Coshow.*

For respondents there was a brief over the name of *Messrs. Cardwell & Watson,* with an oral argument by *Mr. James O. Watson.*

MR. JUSTICE BURNETT delivered the opinion of the court.

There were three brothers and their three sisters: Robert Wade, John M. Wade, Henry Wade, Isabel Ozouf, Anna W. Spencer, and Rebecca Butler. Robert died intestate, seised of a large area of lands in Douglas County, Oregon, and leaving as his only heirs his brothers and sisters who succeeded to his estate under the statutes of descent. Isabel Ozouf has a large amount of property in her own right, besides inheriting a considerable estate from her deceased husband. After the conveyances were made, which the answer attacks, Rebecca Butler died intestate so far as the record here shows. She left four living children surviving her, to wit, Joseph R. Butler, Annie Conlisk, Kate Flye, and Mamie Smiley, besides four grandchildren, offspring of one of her deceased children, namely,

Hazel Northup, Annie Northup, Alice Reed, and William Reed. During the lifetime of her husband, Isabel and he joined in a power of attorney authorizing John A. Black to transact business for them, and he acted as their agent for a considerable period while Mr. Ozouf yet lived. After the death of her husband, Mrs. Ozouf executed a general power of attorney to Black, the terms of which will be more particularly noted further on in this opinion. In pursuance of this general power of attorney, Black, on February 8, 1908, conveyed to John M. Wade, Henry Wade, Anna W. Spencer, and Rebecca Butler, the interest of Mrs. Ozouf in certain timber lands inherited from the estate of her brother Robert Wade. This conveyance was made upon the consideration of $10 and other good and valuable considerations. In the following January, Black, still acting under the same authority, conveyed the interest of Mrs. Ozouf in other lands derived from her brother's estate, to the same parties, naming as the inducement "one dollar and other good and valuable considerations." Still later, during the year 1910, on the petition of Hazel Northup, the County Court of Douglas County adjudged Mrs. Ozouf insane, and appointed John A. Black as her general guardian. Meanwhile Rebecca Butler had died leaving the four children and four grandchildren above mentioned as her heirs. On September 20, 1912, John M. Wade, Henry Wade, Anna W. Spencer, and the surviving children of Rebecca Butler began this suit against Isabel Ozouf and grandchildren of Rebecca Butler already mentioned, to correct an alleged mistake in the conveyances executed by Isabel Ozouf through her attorney in fact.

The complaint further alleges that Hazel Northup claims a greater interest than the one eightieth of the

share in Robert Wade's estate cast upon her grandmother Rebecca Butler by the conveyance in question, and prays that she be restricted to a claim of one eightieth. The general guardian of Isabel Ozouf, John A. Black, filed an answer on her behalf admitting the mistake and consenting to the correction of the same as prayed for in the complaint. Afterward Hazel Northup filed a petition in the Circuit Court where the suit was pending, showing in effect that the general guardian was interested in the result of the suit by reason of having participated in the purchase of the interest of John M. Wade in the property involved, and prayed that she herself be appointed guardian *ad litem* in this suit on behalf of Isabel Ozouf; and the court accordingly made an order appointing her such guardian *ad litem.* Operating under this order as to Isabel Ozouf, the defendants filed an answer which concerning Hazel Northup alleges that during the lifetime of Mrs. Ozouf's husband he and his wife adopted said Hazel as their own child, and that she claims no greater interest in the property involved than would descend to her in case of the death of Isabel Ozouf intestate. On behalf of Annie Northup, Alice Reed, and William Reed, the answer disclaims any interest in the real property by virtue of the alleged deeds from Isabel Ozouf executed by her said attorney in fact. The answer further contains this allegation:

"And the defendants allege that for the purpose of cheating and defrauding the said Isabel Ozouf, and the defendant Hazel Northup, in the event of the death of Isabel Ozouf, the plaintiff Anna W. Spencer, and John A. Black, the son-in-law of said Anna W. Spencer, conspiring together, did, at a time when the said Isabel Ozouf was insane, to wit, on the 23d day of July, 1907, procure a pretended general power of attorney from said Isabel Ozouf, an insane person, purporting to ap-

point the said John A. Black her attorney in fact; that said Anna W. Spencer and the said John A. Black further conspiring to defraud and cheat the defendants Isabel Ozouf and Hazel Northup, without the knowledge of the plaintiffs except the said Anna W. Spencer, on the 8th day of February, 1908, for the recited consideration of $10 and other recited good and valuable considerations, through said power of attorney procured as aforesaid by said John A. Black, did cause a deed to be pretended to be made and executed by Isabel Ozouf, by John A. Black, her alleged attorney in fact, at a time when the said Isabel Ozouf was insane, in favor of the plaintiffs for a portion of the property described in plaintiffs' complaint."

And then sets out the conveyance of February 8, 1908. The answer further makes similar allegations concerning the conveyance of January 4, 1909. Knowledge of the alleged insanity of Isabel Ozouf is imputed to all the plaintiffs by the answer. The defendants pray that the deeds executed by the attorney in fact be canceled and held for naught. The allegations of fraud and insanity were traversed by the reply as stated.

1. At the outset it is apparent that whether Hazel Northup be the adopted daughter of Isabel Ozouf or her own child cannot affect the question here involved. In either event, whether she be a child of the blood or adopted by Mrs. Ozouf, she has no standing to assert or defend any interest which she may expect hereafter in the estate of Mrs. Ozouf. No one can be an heir of a living person. Moreover, parents' lawful children, whether natural or adopted, have no interest in the estate of their living parents by virtue of the relationship of parent and child. The expectancy of title by descent, however strong, carries with it no power to assert or defend an interest in the real property of the

living ancestry. We decline therefore to consider the question of the regularity of the adoption of Hazel Northup.

It may well be questioned whether the Circuit Court could rightly authorize Hazel Northup to act as guardian *ad litem* for Mrs. Ozouf. The only authority vested in such courts to appoint a guardian *ad litem* is found in Sections 32 and 33, L. O. L., providing that a guardian of that kind may be appointed for an infant. Section 1319, L. O. L., vests in the County Court the authority to appoint guardians for insane persons, infants, and all who are incapable of conducting their own affairs; and Section 1327 states that such a guardian "shall appear for and represent his ward in all legal suits and proceedings, unless when another person is appointed for that purpose as guardian or next friend." It is well open to question, therefore, whether the pleading filed by the general guardian ought not to control this litigation as against Mrs. Ozouf. It is questionable, also, whether she can be bound by the statements filed as a pleading in her behalf by the guardian *ad litem*. However, the parties actually appearing have treated the case as if Hazel Northup has a present interest to defend, and a right to attack the conveyances in question, and that she has authority in the suit to represent the grantor in those conveyances in the effort to set them aside. Considering, therefore, without deciding, that the attitude occupied in the pleadings and in the argument of the case is correct so far as the proper parties are concerned, we will consider the issues involved as presented at the hearing. There are three: First, the alleged conspiracy of Anna W. Spencer and John A. Black to defraud Mrs. Ozouf; second, the alleged insanity of the latter at the time she executed the power

of attorney, and at the time her attorney in fact executed the conveyances in her name; and third, considering that the power of attorney was valid, whether its terms authorized the acts of the attorney in fact, which are here questioned.

2. Considering the first of these, it appears in testimony that John A. Black is the son-in-law of Mrs. Spencer. There is no word of testimony indicating that either Mrs. Spencer, Mrs. Butler, or either of the two brothers of Mrs. Ozouf ever sought the conveyance executed to them. In fact, it appears in testimony that neither of the brothers nor Mrs. Butler knew of the conveyance until after it was executed. There is no testimony whatever that any of the brothers or sisters of Mrs. Ozouf ever counseled or requested that the conveyance be executed.

The defendants called John A. Black as a witness on their behalf, and thus vouched for his credibility. He testified, in substance, that the land conveyed was what was known as Mrs. Ozouf's one-fifth interest in the timber lands inherited from Robert Wade; that she retained her interest in about 900 acres of ranch land known as her brother Robert's home place. He further stated on oath as a witness that Mrs. Ozouf and her husband, during his lifetime, talked it over several times that Mrs. Ozouf would give her part of Robert's estate to her brothers and sisters, on account of its being unproductive and that it would be difficult for her to manage the same after his death. The witness declared that Mrs. Ozouf talked the same way after the death of her husband, which occurred in May, 1907, and many times expressed her intention to convey her interest in the timber lands mentioned to her brothers and sisters, and, finally, a few days before the deed was executed, while he was visiting

her at Scottsburg, she expressly directed him to make such a conveyance to her brothers and sisters mentioned; that in pursuance of this direction, acting under the authority of the power of attorney already executed, he went to Roseburg, procured a description of the land from the records there, and executed the first conveyance, naming therein a consideration of $10 and other good and valuable considerations, which sum of money was paid to him by Mrs. Black and Mrs. Spencer; that about 11 months later, acting under the same authority, he executed the second conveyance. There is no testimony disputing the utterances of Black on this point. By inference we may say that the opportunity to conspire existed, but there is no evidence of any such conspiracy.

In passing, it may be remarked that although the suit was begun to correct a mistake in the conveyances, and issue was joined, no testimony whatever was offered by either party on the question of mistake; it appearing to have been lost in the larger contest of whether or not the deeds were at all valid. The matter of the alleged mistake is therefore laid out of the case as not proven.

3. The defendants assert that at the time of the execution of the power of attorney, and subsequently at the time the conveyances in question were executed by the attorney in fact, Isabel Ozouf was insane. Whether she was insane to such a degree that she was not capable of understanding the nature and consequences of the instrument which she executed vesting the power in John A. Black therein set forth is not stated in the pleading. The allegation is simply that she was insane. In the language of *Ames* v. *Ames,* 40 Or. 495, 504 (67 Pac. 737, 741):

70 Or.—37

"The rule is settled in this state that if a testator at the time he executes his will understands the business in which he is engaged, and has a knowledge of his property, and how he wishes to dispose of it among those entitled to his bounty, he possesses sufficient testamentary capacity."

*Chrisman* v. *Chrisman,* 16 Or. 127 (18 Pac. 6); *Potter* v. *Jones,* 20 Or. 239 (25 Pac. 769, 12 L. R. A. 161); *Clark* v. *Ellis,* 9 Or. 128; *Cline's Will,* 24 Or. 175 (33 Pac. 542, 41 Am. St. Rep. 851). The rule is not different respecting the capacity of one executing a power of attorney or a conveyance. If at the time of the execution of the document the grantor has mental capacity sufficient to comprehend the nature of the business in which she was engaged, the instrument is valid: *Carnagie* v. *Diven,* 31 Or. 366 (49 Pac. 891); *Swank* v. *Swank,* 37 Or. 439 (61 Pac. 846); *Dean* v. *Dean,* 42 Or. 290 (70 Pac. 1039); *Hamilton* v. *Holmes,* 48 Or. 453 (87 Pac. 154); *Pickett's Will,* 49 Or. 127 (89 Pac. 377); *Reeder* v. *Reeder,* 50 Or. 204 (91 Pac. 1075); *Ames* v. *Moore,* 54 Or. 274 (101 Pac. 769); *Mansfield* v. *Hill,* 56 Or. 400 (107 Pac. 471, 108 Pac. 1007); *Stevens* v. *Myers,* 62 Or. 382 (121 Pac. 434, 126 Pac. 29); *Bohler* v. *Hicks,* 120 Ga. 800 (48 S. E. 306); *Schmidt* v. *Schmidt,* 201 Ill. 191 (66 N. E. 371); *Bauchens* v. *Davis,* 229 Ill. 557 (82 N. E. 365); *Drum* v. *Capps,* 240 Ill. 524 (88 N. E. 1020); *Conner* v. *Skaggs,* 213 Mo. 324 (111 S. W. 1132); *In re Will of James D. White,* 121 N. Y. 406 (24 N. E. 935); *In re Brush's Will,* 35 Misc. Rep. 689 (72 N. Y. Supp. 421); *Buchanan* v. *Belsey,* 65 App. Div. 58 (72 N. Y. Supp. 601); *McGovran's Estate,* 185 Pa. 203 (39 Atl. 816); *Hemingway's Estate,* 195 Pa. 291 (45 Atl. 726, 78 Am. St. Rep. 815); *Kendrick's Estate,* 130 Cal. 360 (62 Pac. 605); *In re Riordan's Estate,* 13 Cal. App. 313

(109 Pac. 629); *Hartung* v. *Holmes,* 159 Cal. 161 (113 Pac. 130); *Stull* v. *Stull,* 1 Neb. Unof. 389 (96 N. W. 196); *Taylor* v. *McClintock,* 87 Ark. 243 (112 S. W. 405); *Deckenbach* v. *Deckenbach,* 65 Or. 160 (130 Pac. 729). Applying this standard as established by the decisions mentioned, we proceed to examine the testimony respecting the allegation of insanity, bearing in mind that the burden of proof rests upon those who assert that mental condition.

4. The first witness on this question for the defendants was Dr. Patterson, whose deposition discloses that at the time it was taken he was aged 49 years, residing in San Francisco, and had practiced his profession in Central Point, Gardiner, Lake View, and Merrill in the State of Oregon, and later in San Francisco. He said that he treated Mrs. Ozouf somewhere between 1900 and 1903; found that she had delusional insanity, and that her delusion was that "someone had injured or killed her husband or was about to do so, and fancied she heard sweet singing as of angels." The circumstances under which he treated her are thus explained by her sister, Mrs. Spencer: She stated that Mrs. Ozouf had been assisting the other sister, Mrs. Butler, in nursing the latter's husband at Gardiner and was much worn out by continued watching; that she came up the Umpqua River on the steamboat as far as Dean's Creek, and then rowed herself up the latter stream a mile or two to the residence of Mrs. Spencer, and arrived there exhausted; that Dr. Patterson pronounced her ailment nervous prostration, but said nothing about insanity; that he treated her for brain fever. Concerning the supposed delusion, Mrs. Spencer says that, at the time, Mrs. Ozouf had not seen her own husband for quite a period; that he was traveling back and forth between Scottsburg and

Roseburg on horseback, carrying considerable amounts of money with him for deposit in the bank at the latter place; that he journeyed by out of the way roads, and, as he told her, was himself anxious about his safety, and for his protection carried a revolver; that, not having seen her husband for some time, Mrs. Ozouf entertained considerable anxiety about his safety. No other witness besides Dr. Patterson speaks of any specific delusion, and this delusion is in part explained by Mrs. Ozouf's anxiety for her husband.

It has been said in *Fulton* v. *Freeland,* 219 Mo. 494, 517 (118 S. W. 12, 18, 131 Am. St. Rep. 576), that:

"There is no such thing as a delusion founded upon facts. It is a mental conception in the absence of facts. If the idea entertained has for a basis anything substantial, it is not a delusion. There may be a misjudgment of facts, or there may be an accentuated opinion founded upon insufficient facts, but not a delusion, arising to the dignity of a mental aberration."

Under the circumstances disclosed, there was much to justify an anxiety on the part of Mrs. Ozouf for the safety of her husband, which would not amount to a delusion. Counsel for defendants in their brief, however, say in substance that they do not contend that the insanity exhibited at this time was of a permanent character, or that Mrs. Ozouf was habitually insane prior to the latter days of 1907.

Dr. Mingus, a witness for defendants, who was called to see her in conjunction with another physician January 2, 1908, says that she entertained delusions, but does not give the nature of those mental aberrations. He testifies that she was melancholy, but he declares on cross-examination that he did not test her

for memory at the time on account of her general mental condition. He saw her but the one time, and the weight of his testimony is considerably depreciated by the fact that in payment of his services he accepted a check of Mrs. Ozouf drawn February 28, 1908.

Hiram Weatherby, a resident of Scottsburg, where Mrs. Ozouf at that time lived, took her acknowledgment of the power of attorney, which he found in her possession. It seems that her husband died in May, 1907; that afterward, according to this witness, Mrs. Ozouf became melancholy. He says: "Well, she is what I would call insane. I don't know; somebody else might call it something else; I would call her insane." Cross-examined about the matter, he says, referring to the power of attorney, that he did not explain it to her because "she was a woman that didn't need any explaining"; that he supposed that she knew what she was signing and appeared to know what she was about; that he took her acknowledgment to another deed to one McKay on October 7, 1908. This witness fittingly exemplifies the standard of mental capacity established by the numerous authorities above noted.

Another witness, W. H. Fisher, gave it as his opinion that she was insane, because on one occasion while he was sawing wood at her residence he wanted to get water from her tank for his engine, and she said that she did not think they had water to spare; but he also disclosed the fact that others were using from the same tank and that at one time the water was a little short. Another reason assigned by him for believing her insane was that she had hired a horse from him on one or two occasions to drive out to her husband's grave in the country about three miles distant, and

finally she wanted to buy the horse from him. He
said he thought she did not need the horse, and he
never heard anything more about it after a few days.
This witness twice received pay for his services by the
check of Mrs. Ozouf.

T. W. Andrews testified that he set up the monu-
ment at her husband's grave for which she had con-
tracted in the sum of $175; that when it was completed
he told her that the work was done and that he wanted
her to come and see it; that she said that she could
not go then but would pay him; and that she seemed
very nervous; that she made out the check for $1,700
when it should have been $175; that, not having
his spectacles, he did not discover it, but went back
and she wrote the correct amount, asking the witness
to "stay by her and point out to her"; that she was
nervous and said she wanted to finish it up then be-
cause the next day she might be worse. This witness
also said that she wanted to buy a horse from him.
Another reason given for her insanity was that she
lectured him about drinking to excess. ·He admitted
that he was somewhat addicted to that habit and that
Mrs. Ozouf was a very religious woman and strongly
in favor of temperance in such matters. Insanity
cannot be fairly predicated on a single mistake in
drawing a check, upon an offer to buy a horse, or upon
an expressed opinion that the witness should reform
his bibulous habits.

John M. Hedden told about Mrs. Ozouf setting a
fence over on his ground by his consent ten years be-
fore, and then after her husband's death offering him
$1,000 for the same land with the right to pasture his
cow three months in the year; that she wanted to build
a church and contribute one fourth herself, have him
and his wife advance one fourth each, and the public

one fourth; that later in the day she asked him if he had sent for the bill of lumber; and he also says that she objected to his selling a right of way to the S. P. Co., through his premises adjacent to hers, and that she said that she would give him as much herself; that she did not want the railroad to come down on their side of the river. He also produced a letter which Mrs. Ozouf wrote to his wife on the subject of building a church in Scottsburg. The letter is connectedly written and simply shows that she was an enthusiast on the subject of church work, and that, inasmuch as someone was about to establish a saloon in Scottsburg, she thought it ought to be counteracted by the establishment of a church, there being no religious edifice in the place. This witness also is shown to have accepted her checks both before and after the occurrences which he describes.

The defendant Hazel Northup, a witness on her own behalf, noticed a change in Mrs. Ozouf a little before Christmas in 1907; that on one occasion she found her on her knees crying and saying that she was sorry she had treated the witness so badly. This may be explained from the fact that Mrs. Ozouf, as disclosed by other testimony, had made a will which she afterward destroyed because she had given too liberally to this witness and not enough to the brothers and sisters of the latter. Mrs. Northup, after speaking of seeing Mrs. Ozouf in bed in 1908 at the residence of Mrs. Conlisk, testified that the sick woman said that her voice sounded like Hazel's, but it was not Hazel. This also may be accounted for by the fact that in the *interim,* Hazel, contrary to the wishes of Mrs. Ozouf, had gone away from home and married before she was 18 years of age. The witness saw her again in 1910, in Portland, and says of Mrs. Ozouf that: "She sat in a

chair with her hands folded looking down at the floor, and did not talk except when spoken to. I don't think she recognized me, but don't remember much about it now." The last time she speaks of seeing Mrs. Ozouf was a few days before her examination, and merely says, "I don't know whether she recognized me or not."

Dr. Fields treated Mrs. Ozouf first in August, 1907. He visited her twice to treat a severe abscess under her arm, and once when she ran a nail into her foot. He says that beginning in August or September, 1907, she was abnormally excitable, active, talkative, and afterwards drifted into a state where she was morose, melancholy, and quiet. He said he did nothing to test her sanity; just looked at her and talked to her; that sometimes she would give proper answers to his questions and sometimes would not answer him at all. In one instance her relatives sent for him to visit her at Scottsburg; that he ran across her on the street, and that no doubt she knew him, but that she did not look at him or speak to him; that he went to the house and found her upstairs; that she did not want to see him and appeared provoked that he had come, or that her folks had sent for him. He says, too, that he went upstairs and sat on the top step with her and eventually left her in a different frame of mind. He sums up by saying that "she seemed angry at me for coming, though she had no occasion to be so"; that he recalled nothing out of the ordinary in the conversation, and says there was no time, but that she knew any acquaintance she saw. This witness also accepted as pay for his services the checks of Mrs. Ozouf drawn long after the occurrences of which he speaks.

Of the relatives of Mrs. Ozouf, her sister, Mrs. Spencer, her nieces, Mrs. Conlisk, Mrs. Black, and

Mrs. Bell, all testified about her mental condition. It would prolong this opinion to too great a length to quote from their testimony in detail, but they unite in saying that while she grew melancholy and reserved after her husband's death, and was incapacitated by an illness which the physicians pronounced paralysis, she also retained her mentality, and whenever she conversed at all she spoke intelligently and connectedly even up to the time of the hearing. Mrs. Dimick, in no way related to her, but a lifelong friend and acquaintance, visited her in October, 1907, for the purpose of borrowing money, and afterward in November of the same year saw her on the same business. This witness says that Mrs. Ozouf conversed intelligently on the subject of business both times, and that she saw nothing to indicate that Mrs. Ozouf was not competent to attend to the business. This witness saw the patient next in January, 1909, and says that she had changed in the meantime. Speaking of the change, she says: "She did not converse with me then very much. She knew me and answered my questions rationally, but did not converse with me."

G. M. Bassett, cashier of a bank at Drain where she kept an account, testified to having had business correspondence with Mrs. Ozouf during the year 1907, and of meeting her on one occasion, and in substance says that she was of sound mind. Of similar import is the testimony of T. M. Word, present sheriff of Multnomah County, who as notary public on January 31, 1911, took her acknowledgment to a deed executed by her as executrix of her husband's will.

Dr. H. W. Hegele treated Mrs. Ozouf during May and June, 1910, for eczema. He says:

"She had no delusions nor any derangement of any of her mental faculties. As to her mental condition,

she was slow to respond to questions; her volition was not as active as it would be in a person where they did not have the condition of grief such as her case showed. Her replies were very definite and intelligent. I spoke to her about herself, and she told me that she did not care to have anybody bother very much with her; that she liked to be left alone. Her answers were intelligently given. She took time to think them over, because a person of her age does not think rapidly as a person that is younger. Her reason was clear and definite."

He further says that she conversed with him very rationally as late as April 22, 1913.

Dr. Williamson, witness for the plaintiffs, in rebuttal, was for many years a physician at the Oregon State Hospital for the Insane, and a specialist in the treatment of mental and nervous diseases. At the time of the hearing he was conducting a private hospital of his own for the treatment of such maladies. Mrs. Ozouf went to his sanatorium for treatment the latter part of February, 1908, and remained there for several weeks under his daily observation. Dr. Williamson described her physical ailment as the rigidity of paralysis agitans. He says that "her mind was tinged with this melancholy, but, so far as being irrational in her speech, at no time did she express an irrational idea. Her conversation outside of her complaint about herself was always strictly coherent and rational." He further says: "She is not insane. Her mind is affected in this that it does not operate quickly. There is a retardation which she is unable to control; but when it comes to the ultimate expression of her ideas they are rational and correct."

What would seem to be a controlling factor on the subject in this state of the testimony is found in the letters written by Mrs. Ozouf, a few of which only will

be here noticed. In her letter of August 28, 1907, to Mr. Black, she writes about deposits in the Drain bank which had recently suspended; about Hazel coming home with her sister, to stop at Astoria en route, and asks Black to send them money. She tells of suffering with the abscess under her arm, and speaks of other family affairs, and says, "I am piling work onto you." September 10th, she sends the address of some nephews and speaks of receiving a letter from the defendant Annie Northup, and of writing to Hazel to come on without their delayed trunks, and to inform Black that they would be in Portland. September 20th she inquires about her late husband's property and about what notes and mortgages can be first called in. She says she wants Warren Reed's note taken up the day it is due. Later she writes of collecting money from Warren and directs Black to send his note to him. She tells of negotiating the loan to Mrs. Dimick, and says: "I wish I could see you so as to have a talk about business, but this matter is O. K., but we could not wait for you to come." October 31st, she speaks, among other things, about receiving a letter from Mrs. Dimick, and hopes everything will prove satisfactory so that she can have the money. November 22d, she writes to Black about a letter received from Mrs. Dimick complaining that Black had declined the loan of $2,500 already promised by Mrs. Ozouf. The latter hopes it can be arranged rather than break her promise to make the loan. The writer also speaks in that letter of the Fishers, who owed her some money, wanting to dissolve partnership, and says she thought it was all right, but referred them to Black. January 24, 1908, she writes again to Black hoping that he will see that everything is secured about Mrs. Conlisk's house, and asks to have it in-

sured. It otherwise appears in testimony that she had advanced some money to enable Mrs. Conlisk to build a house in Portland, and that she was to be secured by some lien on the house whereby the rent should be applied to the interest. She refers in this letter to Black's intention to go to Roseburg to make a final settlement of her husband's estate, and inquires in what bank he deposited the interest from the loan made to one Maupin. These, with other letters, are as clearly and connectedly written as one could wish, and come from the pen of one evidently well educated and skilled in business. They speak stronger than the testimony of any witness of a clear intellect, and, were the scale otherwise at a balance, would certainly make a preponderance in favor of the plaintiffs who hold the negative of the question at issue.

Considering medical testimony, the evidence given by Dr. Williamson, a skillful alienist of wide experience, who observed her for a long period of time, and that of Dr. Hegele, who observed her much longer than the physicians testifying for the defendants, make a showing certainly of greater value than the evidence of the physicians called for the defendants, especially since the latter gave the patient only casual observation and did not disclose at the time to anyone their belief that she was insane. The value of the opinions of nearly all the witnesses for the defendants is much depreciated by the fact that they transacted business directly with her and took her checks in payment of their demands at the very time they now say she was insane. None of them vouchsafes the idea that she was so insane that she did not or could not understand the nature and quality of the business in which she was engaged. On the contrary, one of them already noted says in substance that she knew enough for that

purpose and did not need any explanation. Her letters show that she recognized Black as her business representative and disclose a capacity for such affairs above the average. A careful study of the testimony leads to the conclusion that the evidence on the subject of Mrs. Ozouf's insanity preponderates in favor of the plaintiffs, and that she was possessed of ample mentality to fully and fairly comprehend the nature of the business in which she was engaged at the time she executed the power of attorney and at the time the deeds were executed by her agent.

5. It remains to determine whether the execution of the conveyances mentioned was within the scope of the authority conferred upon the attorney in fact. His power of attorney, among other things, after appointing him such attorney, authorized him to "lease, let, demise, bargain, sell, remise, release, convey, mortgage and hypothecate lands, tenements, and hereditaments, upon such terms and conditions and under such covenants as he shall think fit. * * And also for me and in my name and as my act and deed, to sign, seal, execute, deliver, and acknowledge such deeds, covenants, indentures, * * and other instruments in writing of whatever kind and nature. Giving and granting unto my said attorney full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises, as fully to all intents and purposes as I might do or could do if personally present, with full power of substitution and revocation, hereby ratifying and confirming all that my said attorney or his substitute or substitutes shall lawfully do or cause to be done by virtue of these presents."

6. It is contended on behalf of the defendant that this authority did not include a gift of the property

involved, and this is technically true; but it is overcome by the other technical truth that the conveyances were made on the money consideration of $10 in one case, and $1 in the later conveyance. The attorney in fact was within the letter of his authority to convey the lands upon such terms as he should think fit. In determining whether the act was within the spirit of the authority conferred upon Black by Mrs. Ozouf, we ·may resort to the parol testimony offered by the parties. The defendants contend that the terms of the power of attorney cannot be enlarged by resorting to such testimony, and that it must speak for itself. This may be conceded, but that is not the question. Section 713, L. O. L., reads thus: "When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing, except in the following cases: (1) Where a mistake or imperfection of the writing is put in issue by the pleadings; (2) where the validity of the agreement is the fact in dispute. But this section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in Section 717, or to explain an ambiguity, intrinsic or extrinsic, or to establish illegality or fraud. The term 'agreement' includes deeds and wills as well as contracts between parties." Here the validity of the power of attorney is the crucial fact in dispute, and for the proper construction of the instrument, in the language of Section 717, L. O. L., we may resort to "the circumstances under which it was made, including the situation of the subject of the instrument, and of the par-

ties to it,'' so that the court may be placed in the position of those whose language it is interpreting.

7. As partly stated above, Mrs. Ozouf was possessed of a considerable fortune of her own, besides which she inherited a large estate from her husband. At the time her interest in the lands in question was unproductive. She was well advanced in years. Her husband advised, and she acquiesced in that counsel, that it would be a burden to her, and that it would be a proper thing to convey her interest in her deceased brother's estate in those lands to her brothers and sisters, and she still had that purpose after her husband's death, as stated by the undisputed testimony of Black, for whose credit as a witness the defendants have vouched by making him speak for them from the witness-stand. This is also disclosed by the testimony of Mrs. Fanny Dimick, a wholly disinterested witness and lifelong friend and acquaintance of Mrs. Ozouf, who states that the latter told her that she did not wish to be burdened with her one fifth of the property of Robert Wade which she had inherited, and that she would like to turn it over to her brothers and sisters. It must be borne in mind, also, that she reserved her interest in about 900 acres of ranch land belonging to her deceased brother. It thus appears that the conveyances were the result of a settled purpose of Mrs. Ozouf formed at the time when no question is made of her soundness of mind. It was a natural and proper thing for her to do considering her financial condition at the time, and the relation she bore to the objects of her bounty. It does not appear anywhere in the testimony that any effort was made by anyone to influence her in her decision, but that it was the culmination of her own matured design. The act of the attorney was within the strict letter as well as within the spirit of the power conferred upon him.

The defendants rely mainly upon the case of *Coulter v. Portland Trust Co.*, 20 Or. 469 (26 Pac. 565, 27 Pac. 266). In that case, under a power of attorney authorizing the agent thus created to buy, sell, or transfer real estate, the attorney in fact conveyed the land to a grantee charging the same with the support and maintenance of a minor daughter of the grantor. The court very properly held that this did not constitute a sale within the meaning of the instrument creating the power, and that it was wholly foreign to the intention of the person creating the agency. In other words, as the court points out, it amounted to an executory agreement, the performance of which by the grantee was in no wise secured. On the subject to which it is applicable, this case is quoted with approval in *Security Savings Bank v. Smith,* 38 Or. 72 (62 Pac. 794, 84 Am. St. Rep. 756), where Mr. Justice WOLVERTON lays down the rule in such matters in this language:

"These rules of construction in no wise conflict, however, with another just as well established, and of equal potency and power, which is that the object of the parties must always be kept in view, and, where the language will permit, that construction should be carried out that will support instead of defeat the purpose of the instrument."

Mr. Justice WOLVERTON also quotes with approval the language of *Hemstreet* v. *Burdick,* 90 Ill. 444:

"But it is said the power must be strictly construed. This may be true, but it does not require that it shall be so construed as to defeat the intention of the parties. Where the intention fairly appears from the language employed, that intention must control. A strained construction should never be given to defeat that intention, nor to embrace in the power what was not intended by the parties."

It follows that the execution of the power of attorney by Mrs. Ozouf was a valid and binding act, and that the deeds in question executed by her attorney in fact in pursuance of that authority are also binding upon her. The Circuit Court erred in setting aside those deeds, and its action in that respect must be reversed. For want of proof the suit of the plaintiffs so far as it contemplates a correction of the alleged mistake must likewise be disregarded.

A decree will therefore be entered here to the effect that the plaintiffs take nothing in respect to the alleged mistake in the conveyance; that the defendants take nothing by their cross-bill; that plaintiffs have a decree establishing the validity of the deeds of February 8, 1908, and of January 4, 1909; and that none of the parties recover costs or disbursements from either of the others.                    MODIFIED.

MR. CHIEF JUSTICE McBRIDE, MR. JUSTICE MOORE and MR. JUSTICE RAMSEY concur.