In the Matter of Proving the Last Will and Testament of ERNEST TEMPLE HARGROVE, Deceased, as a Will of Real and Personal Property.

HENRY BEDINGER MITCHELL, Petitioner, Appellant, Respondent; WILLIAM ARCHIBALD TEMPLE HARGROVE and JOAN LEONA CONSTANCE HARGROVE GIBBS, Respondents, Appellants.

First Department, June 27, 1941.

*Theodore Kiendl* of counsel [*John M. Polk* and *Walter D. Fletcher* with him on the brief; *Davis, Polk, Wardwell, Gardiner & Reed,* attorneys], for the petitioner.

*Vahan H. Kalenderian* of counsel [*Louis D. Posner,* attorney], for the objectants Hargrove and Gibbs.

TOWNLEY, J.   The decree appealed from denies probate to the will of Ernest Temple Hargrove.   This decree was based upon the verdict of the jury which by a vote of ten to two found the deceased lacking in testamentary capacity.   The jury's finding was based upon its conclusion that the testator suffered from an insane delusion that two children born to his wife during their marriage were not his and that as a consequence the testator did not know the true objects of his bounty.   The will made no provision for these children but left all of his property to Mrs. Clement Griscom " as an inadequate acknowledgment of the lifelong kindness shown to me by my business associate and intimate personal friend, her late husband."

With the exception of this claimed delusion about the paternity of his children there is no serious claim of mental deficiency.   The testator appears to have been a very successful business man, capable of managing large interests with conspicuous success and equally successful in the management of many charitable and religious activities in which he became interested.   He was active as president and head of the Griscom-Russell Company, manufacturers of heavy machinery, up to within a month of his death, on April 8, 1939.   The instrument offered for probate was in his own handwriting and executed by him on December 17, 1923. Ten witnesses, all men of importance in New York city, testified that decedent was at all times of sound mind and a man of unusual intelligence and four of these witnesses were called by the contestants.

The only witnesses to the contrary were an alienist who had never seen him and the testator's divorced wife who had not seen him for thirty-one years prior to his death except for an accidental meeting in a book store twenty years prior to his death.   As bearing on the credibility of the latter it is significant that she denied here that the testator prior to his death had ever accused her of being indiscreet, whereas she had obtained a Colorado divorce

from the testator in which she alleged that about three years prior to the date of her complaint, the decedent had accused her of being indiscreet in her association with certain persons and that in November, 1905, he had also made similar charges. In that action the jury found the decedent guilty of the matters charged in the complaint.

The law is that assuming that decedent was mistaken in his belief that he was not the father of the children of his divorced wife, that fact would not necessarily establish testator's incapacity. The rule applicable to the determination of the question was clearly stated in *Matter of White* (121 N. Y. 406, 413) as follows: " Delusion is insanity, where one persistently believes supposed facts, which have no real existence, except in his perverted imagination, and against all evidence and probability, and conducts himself, however logically, upon the assumption of their existence. That was so held in *Seamen's Society* v. *Hopper* [33 N. Y. 624]. But, if there are facts, however insufficient they may in reality be, from which a prejudiced, or a narrow or a bigoted mind might derive a particular idea, or belief, it cannot be said that the mind is diseased in that respect. The belief may be illogical, or preposterous, but it is not, therefore, evidence of insanity in the person. Persons do not always reason logically, or correctly, from facts, and that may be because of their prejudices, or of the perversity, or peculiar construction of their minds. Wills, however, do not depend for their validity upon the testator's ability to reason logically, or upon his freedom from prejudice."

The question presented, therefore, is whether there is any rational basis, however slight, for the decedent's belief that he was not the father. The story of the married life of the Hargroves may be summarized as follows: The deceased married Aimee Neresheimer in 1899. For the next six years he traveled in Europe, Africa and Australia with her. A son was born in Brussels in February, 1902, and a daughter in Dresden in 1904. In 1905 the decedent and his children returned to the United States and took up a residence in Denver, Col. In Denver, the testator became interested in the business of his then father-in-law and in that connection met and became friendly with one Smith, a friend of his father-in-law and his attorney. In the latter part of 1906 the testator's wife asked him for a divorce, claiming incompatibility. This led to many conferences in which testator's father-in-law and Smith assumed to act as friendly advisers. An action for divorce on the ground of cruelty was brought. The entire proceeding from the service of process to the entry of judgment was accomplished in a single day. Within an hour after the entry of the

decree Smith, whom decedent had consulted about his divorce, procured a divorce from his own wife and announced that he would marry the wife of the testator.

The conditions surrounding these decrees created a considerable scandal in Denver. Within a month Smith and the testator's wife were married at the alleged insistence of her father. The testator apparently did not discover the remarriage for some months. He then applied to have the divorce set aside on the ground of fraud and alleged that his wife prior thereto had been guilty of improper relations with Smith. This application was denied upon technical grounds. He thereafter left Denver and came to New York where he was befriended by Clement Griscom, became associated with him in business and died the president of his company. Mr. Griscom's wife is named as beneficiary in this will. Neither the divorced wife nor the children communicated with the deceased during the thirty-one years intervening before his death.

Decedent left an affidavit with his executor stating that his divorced wife had confessed to him that the children were not his and that he had satisfied himself that that was so. He spoke of this belief only to his intimate friends and then only when necessary. His entire conduct in this connection was that of a dignified considerate gentleman and there is nothing in connection therewith which justifies the belief that his opinion was based on an insane delusion. All of his reasons for his belief, of course, cannot be known. They relate to the intimate personal affairs incident to the marriage relation. When consideration is given, however, to his unfortunate experiences in connection with his divorce, the fact of his belief in his wife's infidelity certified to by her under oath in her divorce proceeding and confirmed by the formal affidavit left by him with his executor, it cannot be said that his belief on this subject was entirely without reason, although possibly mistaken.

Upon the foregoing facts the finding that the decedent lacked testamentary capacity cannot be sustained. The conclusion we have reached, however, must not be considered as involving any finding as to the legitimacy of the children involved.

That part of the decree that held that the instrument offered for probate was not revoked by the subsequent codicil was clearly correct. This codicil concededly contained no terms of revocation of the will. The precise terms were not established. There was no inherent inconsistency with the original testamentary plan of the decedent. The revocation of the codicil, therefore, did not necessarily result in the destruction of the will, even assuming the codicil was sufficiently proved. As was said in *Osburn* v. *Rochester Trust*

& *S. D. Co.* (209 N. Y. 54, 56): " While it might often happen that the codicil would be so related to and dependent on the will that it would be impossible to destroy the latter without carrying down the former, the reverse would ordinarily not be true. There would seem to be no good reason why a testator should not be allowed to revoke a codicil, which might be as in this case an entirely separate and distinct instrument, without destroying his will, in itself a full and complete instrument."

The decree so far as appealed from by the contestants should be affirmed. In so far as appealed from by the proponent, it should be reversed, with costs to said appellant payable out of the estate, and the will admitted to probate.

MARTIN, P. J., and CALLAHAN, J., concur; GLENNON and DORE, JJ., dissent.

GLENNON, J. (dissenting). There is ample testimony in the record to support the verdict of the jury that Ernest Temple Hargrove, at the time of the execution of the paper offered for probate, was not of sound and disposing mind and memory. In the course of his charge to the jury, the surrogate clearly stated the issue between the parties to the will contest in the following language: " You can well see that this question is a comparatively simple one. I do not mean by that that it may be simple for you to decide, but I think the issue is simple. It comes down to the issue as to whether or not Mrs. Neres did tell Mr. Hargrove that these children were not his, for of course, if she told him that, and she was the mother of these children, then of course he had ample basis in fact for his belief that these children were not his. However, if her testimony is truthful, that she never told him of this as he says she did, then if this was the mere creature of his imagination, you may find that he was suffering from an insane delusion on this subject."

At the conclusion of the charge, counsel for the proponent said in part: " With that addition, if your Honor please, the proponent is entirely satisfied with your Honor's charge."

The evidence clearly shows that William Archibald Temple Hargrove, who was born in Brussels, Belgium, in February, 1902, is the legitimate son of Ernest Temple Hargrove, deceased, and the latter's former wife, Aimee Neres, and that Joan Leona Constance Hargrove, who was born on August 14, 1904, in Dresden, Germany, is the legitimate daughter of the same parents. At the outset it might be well to note that the son bears in part the given name of the decedent, whereas the daughter, as part of her name, was christened Constance, after the decedent's sister.

The decedent first became acquainted with Aimee Neres, nee Neresheimer, when she was about twelve years of age. At that time she lived with her parents in Bayside, Long Island.

When Mrs. Neres was fourteen years of age, in 1897, the decedent proposed marriage to her and took her to England, under the chaperonage of his sister Constance, to meet his parents. He repeated his proposal upon their return from England, but her father objected to the marriage at that time on account of her age and sent her to a convent in Canada, where she remained for a year and a half. When Mrs. Neres became sixteen years of age, the marriage took place.

They went to England on their honeymoon and thence to the Peace Conference at the Hague. In connection with his work, which we do not deem necessary to go into at this time, they traveled throughout the world. The testimony of Mrs. Neres indicates that their son was conceived in Australia and born in Brussels, while the daughter was conceived in Paris and born, as heretofore noted, in Dresden.

About 1905, they returned to the United States and went to Boulder, Col., to the home where Mrs. Neres' parents then resided and later they moved to Denver, where they took up a residence. We do not believe it necessary to refer at any length to the divorce which was obtained by Mrs. Neres in 1906, since the speed with which it was effected has been covered in the majority opinion.

In his application, sworn to by the decedent on December 12, 1907, to set aside the divorce which Mrs. Neres had obtained, the decedent said in part: " That your petitioner then and there informed said Smith, as his said attorney, that such divorce proceedings would bring disgrace upon the children of said plaintiff and your petitioner, and that he, your petitioner, would resist such proceedings to the utmost, and asked said Smith to aid him in pacifying and conciliating said plaintiff in order to avoid said proposed action for divorce."

It must be conceded that the children, to whom reference was made in the quoted sentence, were his son William and his daughter Joan, and still the decedent under date of February 20, 1920, made the following affidavit which appears in the record:

" ERNEST TEMPLE HARGROVE
    10 Horatio Street
    New York

" Ernest Temple Hargrove of the city and county of New York, being duly sworn, deposeth and saith that he was married to a girl named Amy Neresheimer of Bayside, Long Island, toward the end of the year 1899, though he is not certain of this date; that

he took this woman to Europe with him as his wife and that they also visited South Africa and Australia; that said woman gave birth to two children, the first a boy, born in Brussels, and the second a girl born near Dresden; that in 1894 or 1895, deponent took this woman with the two said children to Denver, Colorado, where her parents were then living; that deponent engaged in business with said woman's father, and with a Denver lawyer named Milton Smith; that within a year of their arrival in Denver, said woman declared her determination to obtain a divorce from deponent; that deponent, knowing she had no grounds for a divorce, thereupon requested said Milton Smith to speak to said woman and to tell her she could not obtain a divorce; that said Milton Smith, to the amazement of deponent, assured him that any woman could get a divorce in Colorado who for any reason whatever was dissatisfied with her husband, showing deponent law books and recent decisions to substantiate this statement; that said Milton Smith urged deponent, so as to avoid publicity and scandal, to concede said woman a divorce, stating to deponent that in all probability a reconciliation would take place in six months; that deponent was at last persuaded and that said woman obtained a decree of divorce within a few weeks thereafter; that within two weeks after said divorce had been obtained by her, deponent learned that Milton Smith had at the same time divorced his own wife, and that Milton Smith had at once married deponent's former wife; that deponent, realizing he had been tricked, was angry, and at an interview with his former wife insisted that she must confess the whole truth to deponent about the past; that said woman thereupon confessed that she had cohabited with a number of men, whose names she gave, after her marriage with deponent, and that two of these men, one a citizen of Chicago, whose name deponent has forgotten, and another a German doctor, whose name was Weidner, were respectively the fathers of her two children; said woman reminded deponent of certain facts, which at the time he had not understood, and which tended to prove that he himself could not have been the father of said children; that deponent shortly thereafter visited Chicago and accused said man, a citizen of Chicago, of being the father of the older of two said children; that said man confessed that he had cohabited with said woman and that said woman at that time had declared her intense desire to have a child by him and that they had cohabited together a number of times at her solicitation; that deponent later verified the other statements said woman made to him during said interview, and that deponent obtained absolute evidence that neither of said children was his; that deponent also investigated said woman's life prior to her marriage to him and learned that she

had been common property in and around Bayside, Flushing, and other small towns on Long Island, prior to said marriage, and that she had been notorious as an immoral character; that deponent knows said woman to be grasping and unscrupulous, and that he makes this affidavit to facilitate the task of the executors of his will in the event that said woman or her children should dare to claim any share of deponent's estate in spite of the explicit terms of said will; and that deponent swears that said woman married deponent under false pretenses and by lying and by concealing vital facts, and that deponent has no children, by her or by any other woman.

"In testimony whereof, deponent hath hereunto subscribed his name and affixed his seal on this twentieth day of February in the year 1920.

"ERNEST TEMPLE HARGROVE."

Since the jury had this exhibit before it, they must have realized that the alleged confession of Aimee Neres as to her intimacy with the citizen of Chicago, who might be styled as the forgotten man, and the German doctor, were the expressions of a mind afflicted with a delusion as to the paternity of his children who would be, under normal conditions, the natural objects of his bounty. If the vigorous denials of Aimee Neres as to these groundless charges of misconduct be cast aside, although the jury had the right to believe her denials and did so, we may ask when was the so-called confession obtained? Manifestly, it could not have been immediately subsequent to her marriage with Milton Smith since, as we have heretofore pointed out, in his affidavit of December, 1907, the decedent indicated that these, his two children, were then uppermost in his mind. Neither could it have been at the chance meeting in a book store in New York in September, 1921, where in the first instance the decedent failed to recognize his former wife and upon being apprised of her identity, the record shows that he fled. Furthermore, that meeting took place about a year after the affidavit of February 20, 1920, was sworn to.

The jury undoubtedly noted that part of the affidavit wherein the decedent referred to his investigations of Aimee Neres' life as a child and stated that she had been "common property" in and around Bayside, Flushing, and other small towns on Long Island. The marriage it will be remembered took place when she was only sixteen years of age, very shortly after she left the school in Canada.

It seems almost absurd to believe that an intensely religious man, which concededly the decedent was, could have subscribed his name, affixed his seal and sworn to a document containing

such outlandish statements if he was not suffering from an insane delusion concerning his children who normally would be the proper objects of his bounty.

We of the minority do not doubt for a moment that in other matters the decedent was capable of sound reasoning. He was, what might be termed, an outstanding success in the business world. Still we repeat that in so far as his children were concerned, he was suffering from an insane delusion.

The question here involved is similar to that which appeared in *Riggs* v. *American Tract Society* (95 N. Y. 503) wherein Judge DANFORTH said, in part:

" The trial judge * * * confined their [the jury's] inquiry to the question whether he was affected with insane delusions in regard to the persons who were the natural objects of his bounty * * * and left them to say * * * whether that delusion * * * ' so took possession of his mind that he could not act upon that subject with sense.' * * *.

" The law was well stated. If delusion existed upon one subject, he was as to that of unsound mind, although in regard to other subjects he might reason and act like a rational man."

The facts disclosed in the case now under consideration clearly raised an issue for the jury and may not be disposed of by the court as an issue of law. In *Matter of Barney* (185 App. Div. 782, 794), this court, through LAUGHLIN, J., said: " The well-settled rule in this class of cases is that if there be more than a mere scintilla of evidence tending to show incompetency to make a will and of such a character that different inferences may fairly be drawn therefrom, the case must be decided as one of fact and if the trial be before a jury it must be left with the jury. (*Hagan* v. *Sone*, 174 N. Y. 317.) " (See, also, *Matter of Eno*, 196 App. Div. 131, 155.)

We are in accord with the views expressed in the majority opinion with reference to the contestants' cross-appeal which pertains to the so-called codicil. We rest our conclusion solely upon the proposition that the jury had ample evidence before it to reach a verdict to sustain the finding that at the time of the execution of the paper offered for probate Ernest Temple Hargrove was not of sound and disposing mind and memory.

DORE, J., concurs.

Decree, so far as appealed from by the contestants, unanimously affirmed. Decree, so far as appealed from by the proponent, reversed, with costs to said appellant payable out of the estate, the will admitted to probate, and proceeding remitted to the Surrogate's Court in accordance with opinion.