Dowling, J.
(dissenting). We have for review a decree denying probate to the will of Wallace B. Hewett, a farmer, late of Oneida County, Hew York. The will was contested on the ground that the testator was suffering from delusional insanity at the time the will was made and by reason thereof he was incompetent to make a will. The Surrogate so found and denied probate on that ground. When the oral testimony upon which reliance is placed to warrant a finding of delusional insanity is read in connection with the written proof, the conclusion is inevitable that such a finding is against the clear weight of the evidence. If the evidence of the widow, Sears and Straight, and the letters written by Hewett to Straight be eliminated, there would be practically nothing in the record upon which to base such a finding. Certainly Mrs. Hewett’s letters to her husband, and those of her lawyer, Cantwell, give no indication that her separation from her husband was compelled by his reflections upon her chastity or by his denial of the paternity of his child. Hewett’s numerous letters, written in 1918 and 1919, all express deep affection for his wife and child. He repeatedly urged his wife to return to him. Except for Mrs. Hewett’s own oral testimony there is little to indicate that Hewett ever questioned his wife’s chastity until, about 1920, when undoubtedly it became evident to him that she was never going to live with him again. Apparently he then sought to obtain a divorce from her. Although prior' thereto Hewett’s letters had indicated deep affection for her and the child, and a desire, on his part, that they should live with him, still his wife, on April 16, 1918, had written him, in substance, advising.him to obtain a divorce, if he wished one, and .stating that she would not even ask for support. He might have inferred from her suggestion that some basis existed in her actions upon which he could procure a decree and this might explain his letters to her friends Sears and Straight. Despite this letter, his subsequent letters, written in 1918 and 1919, disclose the same affection for her and his child as do his previous letters, and he still *1055 continued to urge her to return to him. It seems perfectly evident that it was not earlier than 1920 that Hewett became convinced that the prospect of reconciliation with his wife and child was hopeless. It was then that he wrote the letters to Straight, in an endeavor to have him give testimony in a contemplated divorce action. By 1925 he apparently had made up his mind that he could not obtain a divorce, for we find nothing in the record that, thereafter, he made any efforts so to do. It was then, in 1925, that he made this will, in which he cut off his wife and daughter. Every communication from him to his wife, even the last, written in December, 1919, evidenced affection for her and the child, yet the wife’s testimony is that the last time she wrote him was in July, 1919, followed the next day by an action in replevin, which she began against him to recover some articles of household furniture which she claimed belonged to her. In January, 1920, Hewett apparently was quite seriously ill' in Chicago. Again, in May of that year he underwent an operation in a Utica hospital. Seemingly, he heard nothing from his wife during either illness.
The first documentary evidence which discloses any imputation of unehastity of his wife is found in the letter to Straight written in September, 1920. Hewett evidently had then determined that his wife did not intend to return with her child and live with him. His letters to Straight show that he was seeking to obtain evidence from him upon which to base an action for divorce. This attitude seems to have persisted, according to the testimony of another witness, Sears, until 1925. In testimony, indefinite as to dates, Sears evidently refers to conversations with Hewett during the years 1920 to 1926. Decedent’s effort to obtain testimony against his wife from Sears and Straight was eoneededly reprehensible. Still, the normal explanation would be that, embittered by his wife’s refusal to live with him, he took this course of attempting to end the relationship by a divorce, and that, failing in his efforts, in 1925 he drew the will in question. The record discloses, from 1919 to the time of his death in 1945, no further attempts, on his part, to effect a reconciliation with his wife. He went his way and she and the child went their way. Neither she, nor her daughter, paid any attention to him. Viewed in that light, the will was that of an embittered man, but hardly one suffering from delusional insanity. With no other proof, then, in this record, except the widow’s testimony, and the .testimony of statements made by Hewett that the child was not his daughter (which meant, in the language of those close to the soil, that the child was his wife’s, not his), that decedent had ever denied the paternity of the child, and had ever accused her of being a promiscuous woman prior to the time when it had become clear to Hewett, in 1920, that she and his child would not live with him, her testimony became very important. The testator implored his wife to return to him. She was adamant unless she could dominate him. If he had misgivings as to the paternity of his daughter,' Mrs. Hewett was the cause of them. She told him that he was not the child’s father. If he possessed such an idea, it must be admitted there was some basis for such belief.
They were married on November 1, 1916. She was twenty-nine and he was thirty-five. She left him on June 22, 1917. The baby was born September 19, 1917. She never communicated with him after 1919. The will was madé December 1, 1925. He waited more than eight years after she left him before he made his will. The rational inference is that he did not decide to leave his property to his brothers and sisters until all hope of a reconciliation had vanished. From 1925 until his death twenty years later, his wife and daughter *1056 forgot him completely. When his daughter married, she did not send him an invitation to her wedding. There was nothing in their cold neglect and colder silence for this fifth of a century to cause him to change his will. They come now to east aspersions on his memory in order to share in his hard won savings. His letters in this record and the testimony of his neighbors show him to have been a kindly, intelligent, sane man, one fully competent to make the will before the court.
On Mrs. Hewett’s examination it developed that she had a diary, in which she had entered incidents which had happened during the early stages of their marriage. As to many of these she testified. It was clear that, prior to giving her testimony she had revived her memory by reading this diary. Although it is true that she did not use the diary in the courtroom in connection with her oral testimony, nevertheless it is patent that she had, in anticipation of testifying, refreshed her recollection by it. The learned Surrogate should have directed her to produce this diary for inspection by the cross-examiner. Since the case was on trial before the Surrogate without a jury, such a course presented no practical difficulty. It would have been perfectly feasible to have required the witness to produce it on the next adjourned day (3 Wigmore on Evidence [3d ed.], § 762). Even if the Federal rule, as stated by Mr. Justice Douglas in United States v. Socony-Vacuum Oil Co. (310 U. S. 150, 233) and by Mr. Justice Roberts in Goldman v. United States (316 U. S. 129) be adopted, it was an abuse of discretion, in this particular case, not to have required the production of this diary. One cannot say that this adverse ruling could not possibly have affected the result.
The learned Surrogate fell into reversible error at the threshold of his decision when he said: “ The nature of the issue raised the question of the widow’s reputation as to chastity and good character and since there is no presumption as to character, the burden of proof as to this fact was on the contestants.” In a criminal prosecution where the accused offers no proof of his good character, there is no presumption one way or the other as to whether his general character is good or bad. (People v. Lingley, 207 N. Y. 396, 406.) A different rule applies in civil cases. “It will be presumed that a woman possesses a virtuous character and a reputation for chastity.” (Brisack v. King, 199 App. Div. 213, 214; 1 Wigmore on Evidence, § 75.) This rule is followed in Pratt v. Andrews (4 N. Y. 493, 496) and White v. Newcomb (25 App. Div. 397, 405). The widow’s character was not directly or indirectly in issue in this case. Only her chastity was claimed to have been impugned by the testator. (Ford v. Jones, 62 Barb. 484, 487, 489.) Where the credibility of a party has not been impeached, the rule is that the character of a party in a civil cause cannot be looked to as evidence that he did or did not do an act charged. (Noonan v. Luther, 206 N. Y. 105, 108.) Good reputation does not tend to prove the noncommission of improper acts. A party’s character is of slight probative value. (McKane v. Howard, 202 N. Y. 181, 184, 185.) Every person must be answerable for every improper act and the character of every transaction must be ascertained by its own circumstances and not by the character of the parties. (Fowler v. Aetna Fire Ins. Co., 6 Cow. 673, 675, 676.) There is an exception where a person charged with fraud is dead and the evidence offered to prove the fraud is purely circumstantial. Evidence in such a case, that the deceased bore a good reputation for honesty and integrity is admissible. (Bowerman v. Bowerman, 76 Hun 46, 50, affd. on opinion below 145 N. Y. 598.) Since the proponents did not attack the general good character of the widow and *1057 disclaimed any intention of doing so, evidence of her good character was inadmissible to corroborate her or to negative the probability that the testator had heard rumors that she was unchaste and had based his belief that he was not the father of the child on such rumors so as to give them a basis of fact. (Young v. Johnson, 123 N. Y. 226, 235; Pratt v. Andrews, supra, p. 496.) New York has never adopted the rule prevalent in some States that in a will contest where the husband has disinherited his wife because of her claimed unehastity, that such a claim entitles her to prove her general character so as to make it appear that there could have been no basis in rumor upon which the husband could have formed such an opinion. In such cases the New York courts have followed the rule in Goodnight ex dem. Faro v. Hicks, Winton Summer Assizes 1789 (Bull. N. P. [7th ed., London, 1817], p. 296): “In an ejectment by an heir at law to set aside a will for fraud and imposition committed by the defendant, he shall not be permitted to call witnesses to prove his general good character.” While the evidence as to good character was not objected to by the proponents, it was improperly received and improperly relied on by the learned Surrogate in reaching his decision.
The evidence does not support the decree appealed from. The decree should be reversed, the objections should be dismissed and a decree should be made admitting the will of Wallace B. Hewett to probate. (Matter of Hargrove, 262 App. Div. 202, affd. 288 N. Y. 604.)
All concur in decision except Dowling, J., who dissents and votes for reversal and for admitting the will to probate, in an opinion, and Larkin,. J., not voting. Present — Taylor, P. J., Dowling, MeCurn, Larkin and Love, JJ.
Decree, so far as appealed from, affirmed, without costs of this appeal to any party.